CHEMETRON CORPORATION,
Plaintiff-Appellee
Cross-Appellant,

v.

BUSINESS FUNDS, INC., et al., Defend-
ants-Appellants Cross-Appellees.

No. 80–1658.

United States Court of Appeals,
Fifth Circuit.

Aug. 16, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 20, 1982.

Shearman & Sterling, George J. Wade, New York City, Alan R. Bromberg, Dallas, Tex., Kenneth M. Morris, Morris, Campbell & Seikel, Houston, Tex., for Business Funds, Inc.

Vinson & Elkins, Harry M. Reasoner, John C. Snodgrass, James B. Smith, Jr., Stephen C. Tarry, Charles W. Schwartz, John L. Murchison, Jr., Ann Lents, Houston, Tex., Charles A. Wright, Austin, Tex., for David C. Bintliff.

Wood, Campbell, Moody & Gibbs, Gary C. Miller, Debora D. Ratliff, Robin C. Gibbs, Houston, Tex., for Estate of John F. Austin, Jr.

Reynolds, Allen & Cook, Joe H. Reynolds, Lloyd R. Cunningham, Jr., P. J. Murphey Harmon, Houston, Tex., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Carl E. Rothenberger, Jr., Vincent C. Deluzio, James G. Park, Pittsburgh, Pa., for Chemetron Corp.

Before GEE, REAVLEY, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

## I. INTRODUCTION

We review the latest act in the long-running drama of the Western Equities, Inc. ("Westec") stock scandal. The characters include defendants-appellants, cross-appellees Business Funds, Inc. ("BFI"), a small business investment company, John Austin ("Austin"), chairman of BFI, and David Bintliff ("Bintliff"), a businessman and investor. The final character is plaintiff-appellee, cross-appellant Chemetron Corporation ("Chemetron"). The defendants appeal from a judgment of $18,413,160 in actual and exemplary damages for violations of the federal and Texas securities laws entered against them based on jury answers to special interrogatories.[1] Despite an able job in a very complex case by the district court, we discern several errors requiring reversal and remand.

---

1. Austin died after the filing of this appeal, and his estate is prosecuting it.

## II. FACTS AND DISPOSITION BELOW

This court is quite familiar with the Westec stock scandal.[2] We sketch only those facts necessary for the disposition of this case.

BFI, a Maryland corporation, was a small business investment company formed prior to 1961 with Houston, Texas, as its principal place of business.[3] BFI loaned venture capital to companies in exchange for stock warrants, often providing management expertise and placing representatives on the boards of directors of these companies as well. In order to encourage their growth and enhance its investment, BFI also helped arrange mergers and acquisitions for these companies.

In late 1961, BFI hired James Williams ("Williams") as a vice president to supervise some of its investments. The chairman of BFI at that time was defendant Austin. While he was not a full-time chairman, spending substantial time each week with his principal business, a mortgage-banking firm, he did meet with Williams and discuss his activities several times a week.

Through a series of mergers and acquisitions orchestrated by Williams, Geo-Space, a company in which BFI had invested and for which Williams had responsibility, grew and in 1963 began considering a merger with Westec, a company listed on the American Stock Exchange. A merger with a listed company would substantially enhance the value of BFI's investment in Geo-Space. Williams, assisted by Ernest Hall ("Hall") of Geo-Space, undertook to consummate the merger. They acquired a foothold in Westec with a private nonmarket purchase of Westec stock in August 1963 and elected Williams to the Westec board shortly thereafter. Negotiations on a merger concluded successfully in September 1964. BFI exchanged its Geo-Space stock warrants for stock in Westec, leaving BFI in control of Westec. Williams became chairman of the new company, Hall became president, and Austin was made a director.

From September 1964 until August 1966, Williams and Hall engaged in massive and complex stock operations designed to increase the value of Westec stock. These operations took many forms. For example, Hall repaid a debt to a business associate on the condition that the money be used to purchase Westec stock on the open market during 1964; Williams aided in the financing of this deal, although it is not clear whether BFI was the source of the funds. In another instance, defendant Austin guaranteed a loan in December 1964 from a third party to Hall that Hall used to purchase Westec stock. BFI portfolio companies and Westec subsidiaries also bought Westec shares. In addition, stock was purchased in the name of various relatives and associates of Hall and Williams. In most of these transactions, BFI money appears to have played a role.

In April 1965, Williams resigned from BFI, although his connections with it appear to have continued for a short time thereafter. His departure may have been on unfriendly terms, but this is not altogether clear. About this time, Austin also left the Westec board and BFI distributed its Westec shares to its shareholders. Despite these actions BFI may, however, have continued to influence and control Westec until December 1965.

September 1965 marked the appearance of defendant Bintliff with the acquisition by Westec of Camerina Petroleum Company, partially owned by Bintliff. Bintliff exchanged his Camerina shares for Westec shares. This transaction appears to have been unrelated to the stock price manipulation operation.

Chemetron, a Delaware corporation with its principal place of business in Chicago, began its involvement in 1965, when Williams and Hall sought to acquire a Cheme-

---

**2.** See, e.g., Williams v. Commissioner, 584 F.2d 90 (5th Cir. 1978); United States v. Hall, 457 F.2d 1324 (5th Cir. 1972); United States v. Williams, 447 F.2d 1285 (5th Cir. 1971) (en banc), cert. denied, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972).

**3.** Since initiation of this suit, BFI has become part of the Penn Central Corp.

tron subsidiary, Pan Geo Atlas Corporation ("PGAC"), for Westec. Lengthy negotiations led to an October 1965 tentative deal subject to approval by both parties' boards. On January 14, 1966, Chemetron received Westec stock for its PGAC stock and notes. The transaction was nonmarket, and a Chemetron official testified at trial that the market price of Westec shares played no role in Chemetron's evaluation of the deal. Chemetron claims it was never told of the stock manipulation scheme and would not have made the deal had it known.

The manipulative activities of Hall and Williams continued after the Chemetron transaction. They ordered Westec stock in the names of third parties, seeking loans to finance the purchases. One such loan was secured by defendant Bintliff, for which he received Westec stock as a fee. Bintliff also bought Westec stock from a third party in a sale arranged by Williams.

In August 1966, as part of the scheme, Williams and Hall placed a large stock order they could not finance. Bintliff declined to finance it. Chemetron was approached to finance it but declined and informed the Securities and Exchange Commission and the American Stock Exchange, which suspended trading in Westec stock. At that time Chemetron was the largest shareholder of Westec. Shortly after the suspension of trading, Westec went into Chapter X reorganization, emerging as a reorganized company in 1969. Chemetron exchanged its Westec shares with the bankruptcy trustee in 1969, receiving shares and notes in the reorganized company.

The failure of Westec spawned an avalanche of litigation. This suit began in 1967 when Chemetron sued 57 defendants seeking recovery of its losses under many provisions of the federal and Texas securities laws. Chemetron basically alleged a plan, scheme, or conspiracy to manipulate the

price of Westec stock through actual or apparent trading, thereby inducing transactions by others, leading to its injury when Westec collapsed. After lengthy discovery and settlement with or voluntary dismissal of 53 of the defendants, the case against four defendants, BFI, Austin, Bintliff, and Brazos Valley Cotton Oil Company ("Brazos Valley"), came to trial in the Southern District of Texas before a jury in 1979. The legal claims had been narrowed to violations of three statutes: (1) section 9 of the Securities Exchange Act of 1934, 15 U.S.C. § 78i (1976); (2) section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1976), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (1981), thereunder; and (3) Tex.Rev.Civ.Stat.Ann. art. 4004 (Vernon 1966), the Texas anti-fraud statute.[4]

In response to 31 special interrogatories, the jury completely exonerated Brazos Valley and found no section 9 violation. However, the trial judge entered judgment for Chemetron under section 10(b), Rule 10b–5, and article 4004 based on the jury's remaining responses. The three defendants were held jointly and severally liable for actual damages of $4,726,128 under federal and state law, prejudgment interest of $4,817,276, and exemplary damages under art. 4004 of $9,452,256, less settlement of $582,500, for a total liability of $18,413,160. All defendants moved for judgment n. o. v. or a new trial, which were denied. All now appeal to this court. Chemetron lodges a cautionary cross-appeal.

### III. ISSUES ON APPEAL

A. Federal Securities Law Claims.

■ Chemetron alleged that appellants illegally manipulated the national securities exchange market for Westec stock and failed to disclose or made misleading statements about that scheme in violation of two

---

4. Art. 4004 was repealed effective September 1, 1967, shortly after Chemetron's complaint was filed on August 21, 1967, by ch. 785, § 4, 1967 Tex.Gen. Laws, and reenacted as Tex.Bus. & Comm.Code § 27.01 (Vernon 1968). There was no change in the statute relevant to our

disposition. For consistency with prior proceedings in this case, we refer to the Texas claim as arising under art. 4004 throughout.

federal securities laws, section 9(a)[5] of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(a) (1976), and SEC Rule 10b–5,[6] 17 C.F.R. § 240.10b–5 (1981), enacted pursuant to section 10(b)[7] of the 1934 Act, 15 U.S.C. § 78j(b) (1976). Section 9(e)[8] of the 1934

5. Section 9(a) provides:

(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

(3) If a dealer or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security registered on a national securities exchange by the circulation or dissemination in the ordinary course of business of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any one or more persons conducted for the purpose of raising or depressing the prices of such security.

(4) If a dealer or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, to make, regarding any security registered on a national securities exchange, for the purpose of inducing the purchase or sale of such security, any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which he knew or had reasonable ground to believe was so false or misleading.

(5) For a consideration, received directly or indirectly from a dealer or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security registered on a national securities exchange by the circulation or dissemination of information to the effect that the price of any such security will or is likely to rise or fall because of the market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.

(6) To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security registered on a national securities exchange for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

6. Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

7. Section 10(b) declares:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

8. Section 9(e) reads:

(e) Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such

Act, 15 U.S.C. § 78i(e) (1976), creates an express private remedy for violations of section 9(a), and an implied private cause of action has long been recognized under section 10(b) and Rule 10b–5, *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

While Chemetron specifically alleged violations of subsections 9(a)(1), (2), (4), and (6), the trial judge submitted to the jury only the subsection 9(a)(2) allegation, directed at the manipulative stock scheme itself. However, all three subsections of Rule 10b–5 were submitted, permitting the jury to hold appellants liable under Rule 10b–5 for either the stock scheme (Rule 10b–5(a) and/or (c)), its misrepresentation/nondisclosure (Rule 10b–5(b)), or both.

In response to Special Interrogatory No. 6, the jury found that Chemetron had not proven that the stock scheme "affected" the price it paid for the Westec stock, a necessary element of a section 9 claim, *see* section 9(e), 15 U.S.C. § 78i(e). This finding foreclosed any relief under section 9. Nevertheless, the trial court entered judgment for Chemetron on its federal law claim based on Rule 10b–5. The judgment

of the trial court does not specify which of Rule 10b–5's subsections or combination of subsections it relies on. However, since the jury found that there was a manipulative stock scheme and that the scheme was not disclosed to Chemetron, the trial court's judgment could have been based on Rule 10b–5(a) or (c) (banning fraudulent schemes in general), on Rule 10b–5(b) (prohibiting misrepresentation/nondisclosure), or on both. Thus the very jury findings that barred section 9 relief permitted, without any inconsistency, relief under Rule 10b–5.

Appellants assail this result, claiming that this overlap in private remedies impermissibly nullifies the express remedy and limitations of section 9. This question of whether an implied private remedy is available under Rule 10b–5 for activities covered by section 9's express private remedy is one of first impression in this circuit.[9] Our task is to examine both of the possible bases for Rule 10b–5 liability, the existence of a stock scheme and its misrepresentation/nondisclosure, to determine whether they impermissibly nullify the express section 9 remedies. If both nullify section 9, the trial court's judgment based on Rule 10b–5 has no legal support and must be reversed.

act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant. Every person who becomes liable to make any payment under this subsection may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment. No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

**9.** Few courts have confronted this precise question, and we are the first to do so primed with the benefits of several recent and significant Supreme Court securities law cases.

In *United States v. Charnay*, 537 F.2d 341 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 528, 50 L.Ed.2d 610 (1976), the court, though not directly confronted with this claim, dis-

missed it without analysis in a footnote. *See id.* at 351 & n.14. In 1975, the Seventh Circuit in *Schaefer v. First National Bank of Lincolnwood*, 509 F.2d 1287, 1291–93 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976), held that a plaintiff could file claims under both Rule 10b–5 and § 9. In *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 788 (2d Cir. 1951), the court suggested in dicta that the plaintiffs could, on remand, amend their complaint to state both claims. *But see, e.g., Amdur v. Lizars*, 39 F.R.D. 29, 36 n.13 (D.Md.1965), *aff'd*, 372 F.2d 103 (4th Cir. 1967), where the court declared that, despite dicta in *Fischman*, it was "not prepared . . . to hold the express remedies, such as . . . Section 9(a) . . ., made available by the [1934] Act . . . can be ignored or by-passed in favor of an implied remedy derived from a rule passed by the Commission under the same Act."

More recently, *Wolgin v. Magic Marker Corp.*, 82 F.R.D. 168, 179–81 (E.D.Pa.1979), *interlocutory appeal denied*, 472 F.Supp. 436, 438 (E.D.Pa.1979), permitted plaintiffs to plead both causes of action but acknowledged that the question was a close and difficult one.

For purposes of analysis, we will address two specific questions: (1) is subsection 9(a)(4), which prohibits misrepresentation/nondisclosure, nullified by the similar prohibition in Rule 10b–5(b), and (2) do the general bans on fraudulent schemes and courses of business in Rule 10b–5(a) and (c) nullify the bans on specific stock manipulation schemes found in subsections 9(a)(1), (2), or (6)? [10]

**1. Supreme Court Guidance and Circuit Precedent.**

Our analysis of these questions begins with the premise that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979).

Looking first to the Supreme Court for direction, we find that, although it has not yet addressed the question of maintaining an implied cause of action in the face of an express cause of action, *see Ernst & Ernst*, 425 U.S. at 211 n.31, 96 S.Ct. at 1389 n.31; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 n.15, 95 S.Ct. 1917, 1933 n.15, 44 L.Ed.2d 539 (1975); *infra* note 11, its decisions provide some guidance. In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court declined to imply a cause of action under section 17(a) of the 1934 Act, 15 U.S.C. § 78q(a) (1976), for customers of securities brokerage firms against accountants who audit section 17(a) reports. The Court found support in the statutory scheme created by Congress:

> But we need not decide whether Congress expressly intended § 18(a) to provide the exclusive remedy for misstatements contained in § 17(a) reports. For where the principal express civil remedy for misstatements in reports created by Congress contemporaneously with the pas-

sage of § 17(a) is by its terms limited to purchasers and sellers of securities, *we are extremely reluctant to imply a cause of action in § 17(a) that is significantly broader than the remedy that Congress chose to provide.*

*Id.* at 574, 99 S.Ct. at 2488 (citations and footnotes omitted, emphasis added). It also noted evidence in legislative history that section 18(a) was intended to be the exclusive remedy, *id.* at 573 & n.15, 99 S.Ct. at 2487 & n.15 and warned that even the "remedial purposes" of the securities laws "will not justify reading a provision more broadly than its language and the statutory scheme reasonably permit," *id.* at 578, 99 S.Ct. at 2490.

Under *Ernst & Ernst*, proof of scienter is required in a private suit under Rule 10b–5. In reaching this conclusion, the Court found it significant that sections of the 1933 Act allowing recovery for mere negligence are subject to restrictions not applicable to section 10(b), 425 U.S. at 209, 96 S.Ct. at 1388, and observed:

> We think these procedural limitations indicate that the judicially created private damages remedy under § 10(b)—which has no comparable restrictions—cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing. Such extension would allow causes of action covered by §§ 11, 12(2), and 15 to be brought instead under § 10(b) and thereby *nullify the effectiveness of the carefully drawn procedural restrictions on these express actions. We would be unwilling to bring about this result absent substantial support in the legislative history, and there is none.*

*Id.* at 210–11, 96 S.Ct. at 1388–89 (footnotes and citations omitted, emphasis added).

Finally, in *Blue Chip* the Supreme Court considered whether stock offering offerees can maintain a Rule 10b–5 cause of action despite the fact that they were neither purchasers nor sellers of the offered shares as required by the express terms of Rule 10b–5 and section 10(b). In holding that

---

**10.** Because there were no specific allegations of violations of § 9(a)(3) and (5), which prohibit dissemination of information on predicted stock values or trading, commonly known as

"prophecies," the question of their nullification by Rule 10b–5 is not before us. However, our entire analysis applies to them with equal force and would yield the same conclusions.

such offerees have no Rule 10b–5 cause of action, it reviewed the various express remedies under the 1933 and 1934 Acts, including section 9, and declared that "[i]t would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." 421 U.S. at 736, 95 S.Ct. at 1925 (footnote omitted).

From these decisions, we conclude that our examination of these questions must focus on whether permitting a Rule 10b–5 action here will impermissibly broaden the section 9 remedy by nullifying its restrictions in defiance of the congressional mandate. In addressing that issue, this court in *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981), *modified on denial of rehearing and of rehearing en banc*, 5th Cir. 650 F.2d 815, *cert. granted*, —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982)

*(Nos. 81–680, 81–1076),[11] agreed with the approach used in the Second and District of Columbia Circuits. *See Wachovia Bank & Trust Co. v. National Student Marketing Co.*, 650 F.2d 342 (D.C.Cir.1980), *cert. denied sub nom. Peat, Marwick, Mitchell & Co. v. Wachovia Bank & Trust Co., White & Case v. Wachovia Bank & Trust Co., and Joy v. Wachovia Bank & Trust Co.*, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981); *Ross v. A. H. Robins Co.*, 607 F.2d 545 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The *Huddleston* analysis must be applied in this case, since we are bound by it until it is reversed by the Supreme Court or overruled by this circuit en banc. *S & H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1278–79 (5th Cir. 1981).[12]

In *Huddleston*, plaintiffs sought damages for alleged materially misleading statements in a prospectus. 640 F.2d at 539.

---

11. The grant of certiorari was limited to two questions. In No. 81–680, the question is:

 Does implied remedy exist under either § 10(b) of 1934 Securities Exchange Act or § 17(a) of 1933 Securities Act for purchasers of securities who have express remedy under § 11 of 1933 Act by virtue of fact that securities purchased were issued pursuant to registration statement filed as required by § 5 of 1933 Act?

 50 U.S.L.W. at 3796 (1982). The question in No. 81 1076, which is irrelevant in this case due to our disposition, is: "Is clear and convincing standard appropriate burden of proof in private Rule 10b 5 actions?" *Id.* at 3797.

12. Prior cases in this circuit do not permit us to forego the *Huddleston* analysis.

 In *Alabama Farm Bur. Mut. Cas. Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602 (5th Cir. 1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980), plaintiffs brought a derivative action under Rules 10b–5 and 14a 9 against defendant directors and officers for their stock repurchase program. Under Rule 10b 5, plaintiffs alleged that the repurchase program was an undisclosed "manipulative device" to boost the price of corporate stock and thereby protect incumbent management's control of the corporation. *Id.* at 605. The court reversed the district court's grant of summary judgment for the defendants on this issue, *id.* at 617, holding that the program and nondisclosure of material facts concerning it could violate Rule 10b -5, *id.* at 611-13. The court in *Alabama Farm Bureau* was not presented with a § 9 cause of action since the stock was apparently not registered on a na-

tional securities exchange as § 9 requires, and therefore did not consider the conflict we face here. Judge Rubin, the author of *Huddleston*, did not consider his opinion in *Alabama Farm Bureau* dispositive of the conflict presented in *Huddleston*, nor do we believe it resolves the conflict presented here.

 We also note that some Fifth Circuit cases have been cited as holding that "remedies of the two [1933 and 1934] Acts are cumulative and that plaintiffs have a choice in the event of overlap." *Wachovia*, 650 F.2d at 357 n.33, *citing Wolf v. Frank*, 477 F.2d 467, 475 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973), and *Rekant v. Desser*, 425 F.2d 872, 882 (5th Cir. 1970).

 However, in *Wolf* the district court held and this court affirmed that (1) plaintiffs had no individual claim under Rule 10b–5 but that derivative relief under Rule 10b–5 was available and that (2) plaintiffs had an individual claim under § 12 of the 1933 Act, 15 U.S.C. § 77*l* (1976), but no derivative claim. *See* 477 F.2d at 471–73, 475–76, 478–79. Thus, *Wolf* held those remedies cumulative only insofar as it permitted plaintiffs to maintain different causes of action, one implied and one express, in different capacities, as individuals and derivatively.

 In *Rekant*, although this court cited the Second Circuit dicta in *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 787 (2d Cir. 1951), which underlies *Ross, Wachovia,* and *Huddleston*, the court held it "unnecessary to determine" whether an implied cause of action exists under Rule 15d- 1, promulgated pursuant to § 15(d) of the 1934 Act, 15 U.S.C. § 78*o*(d)

There existed a conflict between sections 11 and 12(2) of the 1933 Act, 15 U.S.C. §§ 77k and 77*l* (2) (1976), each of which creates an express remedy for such *misrepresentations, and Rule 10b–5.[13] The court compared the competing causes of action to determine whether Rule 10b–5 requires proof of facts "not necessary to recovery" under the express causes of action, reasoning that if Rule 10b–5 requires additional facts creating a higher burden of proof, the Rule 10b–5 implied action is available. *See* 640 F.2d at 542. The court permitted the implied action because Rule 10b–5 requires deceit committed with scienter, elements not found in sections 11 and 12(2). *See id.*[14]

With these Supreme Court and Fifth Circuit cases to guide us, we turn now to the specific questions before us.

### 2. The Misrepresentation and Nondisclosure Remedies.

Our examination of this issue begins with a comparison of the texts of the statute and rule. Subsection 9(a)(4) contains a provision forbidding misrepresentation that is quite similar to that found in Rule 10b–5:

> (a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—
>
> . . . .
>
> (4) If a dealer or broker, or other person selling or offering for sale or purchasing or offering to purchase the security, *to make,* regarding any security registered on a national securities exchange, *for the purpose of inducing the purchase or sale of such security, any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material*

---

(1976). Since the court failed to cross that threshold, it did not reach the question analogous to the one presented here of whether two *implied* remedies that overlap may be pursued simultaneously. *See* 425 F.2d at 882.

Neither *Wolf* nor *Rekant* requires us to recognize a § 9 remedy here and forego the *Huddleston* analysis.

**13.** The opinion does not mention a § 9 claim, and there probably was no basis for one since the misleading statements were not alleged to be part of a stock manipulation scheme, and the stock at issue was apparently not registered on a national securities exchange as § 9 requires.

**14.** In *Ross*, the claims involved stock price manipulation and artificial price inflation through dissemination of false and misleading information in annual reports, press releases, a prospectus, and 10-K forms, some of which were filed with the SEC. *See* 607 F.2d at 547. There was apparently no § 9 claim, despite the fact that some of the statements may have violated § 9, and the stock was registered on a national securities market as § 9 requires. The court permitted a Rule 10b–5 action despite a conflict with the express remedy in § 18 of the 1934 Act, 15 U.S.C. § 78r (1976), for false statements in SEC-filed documents because Rule 10b 5 required the "far more difficult task" of proving fraud and scienter that justified dispensing with § 18's reliance requirement. *See* 607 F.2d at 555 56.

*Wachovia* dealt with allegations of artificial stock price inflation through numerous oral and written misrepresentations, including press releases, SEC-filed reports, and unfiled reports. *See* 650 F.2d at 345. Absent, however, was a § 9 claim, and there probably was no basis for one, since it appears that the stock at issue was traded over the counter and not on a national securities exchange. *See SEC v. National Student Marketing Corp.*, 457 F.Supp. 682, 687 (D.D.C.1978). The court held that Rule 10b–5's fraud requirement, which imposes a "higher burden of proof," was a "trade-off" for the restrictions of §§ 11 and 12(2) of the 1933 Act and § 18 of the 1934 Act, 15 U.S.C. §§ 77k, 77*l* (2), and 78r (1976). *See* 650 F.2d at 355–58.

*Huddleston, Wachovia,* and *Ross* posited another reason, not present here, for permitting an implied cause of action. If those courts had permitted only express remedies, the availability of those remedies would have depended in part on whether the documents containing the misrepresentations were filed with the SEC. However, all three opinions concluded that basing liability on such a vagary would be irrational and therefore permitted an implied cause of action under Rule 10b 5 free of the filing requirements of the express remedies. *See* 640 F.2d at 542–43; 650 F.2d at 357; 607 F.2d at 556. Since § 9 does not require documents to be filed with the SEC, this rationale for permitting a Rule 10b-5 action in the instant case is inapplicable.

*fact, and which he knew or had reasonable ground to believe was so false or misleading.*

15 U.S.C. § 78i(a)(4) (emphasis added).

It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

. . . .

(b) *To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading* . . . .

17 C.F.R. § 240.10b–5(b) (emphasis added). The prohibition in subsection 9(a)(4) is certainly intended to apply to misrepresentations made in the course of manipulative schemes banned by section 9. *See* H.R.Rep. No.1383, 73d Cong., 2d Sess. 10–11 (1934), *reprinted in* 5 J. S. Ellenberger & E. P. Mahar, *Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934*, Item 18 (1973) (hereinafter cited as Ellenberger & Mahar); S.Rep.No.792, 73d Cong., 2d Sess. 12–13 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17. Whether Rule 10b–5(b) can also be applied to misrepresentations in the course of a manipulative scheme banned by section 9 turns on the results of the *Huddleston* analysis.

As the *Huddleston* court stated:

The elements necessary to prove a Section 10(b) claim have been so often applied by the lower federal courts that they can be stated in black letter fashion. To make out a claim under Section 10(b), which is based on the common law action of deceit, the plaintiff must establish (1) a misstatement or an omission (2) of material fact (3) made with scienter [15] (4) on which the plaintiff relied (5) that proximately caused his injury.

640 F.2d at 543 (footnote omitted). Subsection 9(a)(4), as privately enforced through subsection 9(e), requires a (1) misstatement or omission [16] (2) of material fact [17] (3) made with scienter [18] (4) for the purpose of induc-

---

**15.** The definition of scienter in this circuit follows that of the Supreme Court in *Ernst & Ernst*: "A mental state embracing intent to deceive, manipulate, or defraud," 425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12. *Broad v. Rockwell Internat'l Corp.*, 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). However, this circuit, like others, permits the Rule 10b–5 scienter requirement to be fulfilled by recklessness, which is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 961–62. The Supreme Court has reserved the question of whether scienter under Rule 10b–5 includes recklessness. *See Aaron v. SEC*, 446 U.S. 680, 686 n.5, 100 S.Ct. 1945, 1950 n.5, 64 L.Ed.2d 611 (1980); *Ernst & Ernst*, 425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12.

**16.** Although the express language of § 9(a)(4) addresses only "false or misleading" statements and not omissions, Congress intended it to cover omissions as well. *See* H.R.Conf. Rep.No. 1838, 73d Cong., 2d Sess. 32 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 20 ("The Senate amendment . . . expressly provides that a statement shall be construed to include any omission to state a material fact. The latter provision is omitted from the substitute as surplusage, in view of the fact that a statement obviously may be misleading because of a material omission."); *cf. In re Penn Central Securities Litigation*, 357 F.Supp. 869, 876–77 (E.D.Pa.1973), *aff'd*, 494 F.2d 528 (3d Cir. 1974) (identical phrase in § 18(a) of the 1934 Act, 15 U.S.C. § 78r(a) (1976), construed to include omissions).

**17.** Subsection 9(a)(4) addresses statements or omissions that are "false or misleading with respect to any material fact."

**18.** Subsection 9(a)(4) covers statements or omissions made if the speaker "*knew or had reasonable ground to believe*" that they were false or misleading. (emphasis added). Subsection 9(e) applies to "[a]ny person who *willfully participates* in any act or transaction in violation of subsection (a) . . . ." (emphasis added).

The interplay of § 9(a)(4) and (e) yields at most two standards for actionable behavior. The first, a statement or omission *known* to be false or misleading and *willfully* made, clearly constitutes scienter. The second, a statement or omission *believed* to be false or misleading at the time and under the circumstances made,

ing a sale or purchase of a security [19] (5) on which the plaintiff relied [20] (6) that affected plaintiff's purchase or selling price.[21]

■ We thus perceive that the implied cause of action under Rule 10b–5(b) and the express remedy of subsection 9(a)(4) differ in at least three respects, scienter, intent to induce a purchase or sale, and causation. While Rule 10b–5 permits recklessness to fulfill its scienter requirement, *see supra* note 15, section 9(a)(4) and (e) and its legislative history do not permit us to loosen its scienter requirement by permitting recklessness to suffice. *See* S.Rep.No.792, 73d Cong., 2d Sess. 17 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17; H.R.Rep. No.1383, 73d Cong., 2d Sess. 20 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 18. Therefore, section 9's scienter requirement is stricter than Rule 10b–5's.

Furthermore, the "intent to induce" requirement of subsection 9(a)(4) is distinct from the scienter requirement of Rule 10b–5(b). While one may intend to do a fraudulent act thereby fulfilling Rule 10b–5(b)'s scienter requirement, the intent that that act *induce a purchase or sale* is a distinct and more specific requirement. Thus the "intent to induce" requirement creates a higher burden of proof for the plaintiff

under section 9(a)(4) than that borne under Rule 10b–5(b).

Finally, subsection 9(a)(4)'s causation standard is also tougher for a plaintiff—the plaintiff's purchase or sale price must be "affected," while "the causation requirement is satisfied in a Rule 10b–5 case only if the misrepresentation *touches upon* the reasons for the investment's decline in value." *Huddleston*, 640 F.2d at 549 (emphasis added). This case presents the classic example of the difference in liability under these causation standards. The jury found that the nondisclosure of the manipulative scheme did not "affect" the price that Chemetron negotiated in its nonmarket purchase of Westec stock—thus no subsection 9(a)(4) remedy. However, the nondisclosure obviously touched upon the reason for the decline in value of Chemetron's Westec stock because the nondisclosure hid the manipulative scheme.

Rule 10b–5(b) therefore requires no *additional* proof of facts creating a *higher* burden of proof when compared to subsection 9(a)(4). In fact, Rule 10b–5(b) creates a lower burden of proof than does subsection 9(a)(4) [22] and contains no elements that compensate for this change. Lacking a

yet *willfully* made, also constitutes scienter. *See* Prosser, *Torts* § 105 at 685- 86, § 107 at 700 01 (4th ed. 1971).

**19.** Subsection 9(a)(4) applies to statements or omissions made *"for the purpose of inducing* the purchase or sale" of a security. (Emphasis added). Subsection 9(e) applies to "[a]ny person who *willfully participates* in any act or transaction in violation of subsection (a) . . . ." (emphasis added).

**20.** As Judge Rubin stated in *Huddleston*, reliance and causation are related but distinct concepts. *See* 640 F.2d at 549. Under § 9, causation is established by the "affecting price" requirement. *See infra* n.21.

We hold that § 9(a)(4) also requires reliance on the omissions or misstatements. The legislative history of § 9 makes clear that Congress desired that reliance be established. "[T]he burden is on the plaintiff to show . . . the fact that the statement was false or misleading, and that he relied thereon to his detriment." S.Rep.No. 792, 73d Cong., 2d Sess. 13 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17. This is in accord with the observation that the

securities law remedies for misrepresentation are rooted in the common law tort cause of action for deceit, *see, e.g., Huddleston*, 640 F.2d at 547 n.21 (Rule 10b–5 derived from deceit action), a basic element of which was reliance by the plaintiff. Prosser, *Torts* § 105 at 685–86, § 108 at 714–18 (4th ed. 1971); *Restatement (Second) of Torts* § 537 (1977); *cf. Rosenberg v. Hano*, 121 F.2d 818, 821 (3d Cir. 1941) (§ 9 implements common law doctrine of time limitation).

**21.** Subsection 9(e) extends liability "to any person who shall purchase or sell any security at a *price which was affected by* [an] act or transaction [in violation of subsection (a)]." (emphasis added).

**22.** *Accord* 1 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 2.5(4) (1968) ("Proof requirements appear *much easier* under 10b -5 than under express civil-liability provisions for market manipulation.") (emphasis added, footnote citing § 9 omitted).

trade-off for this easing of the burden of proof and concomitant enlargement of the plaintiff class,[23] we hold that permitting a judgment for Chemetron under a Rule 10b–5(b) implied action for misrepresentation or nondisclosure of the stock scheme impermissibly nullifies Congress' deliberate and careful limitations on the express statutory remedy of subsection 9(a)(4).[24]

### 3. The Stock Manipulation Remedies.

Because there are some differences between subsections 9(a)(1), (2), and (6), we must compare each separately to Rule 10b–5(a) and (c) to fulfill the *Huddleston* analysis.

#### a. *The Elements of Rule 10b–5(a) and (c).*

To violate Rule 10b–5(a) and (c), a person must (1) employ a device, scheme, or artifice to defraud or engage in a course of business that operates as a fraud (2) with scienter [25] (3) on which the plaintiff relied [26] (4) that proximately caused his/her injury.

#### b. *The Elements of Subsection 9(a)(1).*

■ To make out a violation of subsection 9(a)(1) in a private action under subsection 9(e), a plaintiff must prove the existence of (1) a wash sale or matched orders in a security [27] (2) done with scienter [28] (3) for the purpose of creating a false or misleading appearance of active trading in that security [29] (4) on which the plaintiff relied [30]

**23.** This concern over "inexorable broadening of the class of plaintiffs" under Rule 10b–5, *Blue Chip*, 421 U.S. at 748, 95 S.Ct. at 1931, has consistently been expressed by the Supreme Court, *see, e.g., Ernst & Ernst*, 425 U.S. at 214 n.33, 96 S.Ct. at 1391 n.33; *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 478–79, 97 S.Ct. 1292, 1303 ·1304, 51 L.Ed.2d 480 (1977), and by this circuit, *see, e.g., Herpich v. Wallace*, 430 F.2d 792, 804- 05 (5th Cir. 1970).

**24.** While we have reached our conclusion by focusing solely on the burden of proof, there are also procedural limitations on § 9 remedies not present in Rule 10b–5 actions. *See* § 9(e) (discretionary security costs and fees, right of contribution, uniform federal statute of limitations). The Supreme Court has emphasized that courts must respect both the substantive and procedural limitations imposed by Congress. *See, e.g., Ernst & Ernst*, 425 U.S. at 210 11 & nn. 29, 30, 96 S.Ct. at 1389 & nn.29, 30. Consideration of these procedural limits reinforces our conclusion.

Finally, we also note the presence of an "additional consideration[ ] that weigh[s] heavily against permitting a cause of action under Rule 10b 5," *Santa Fe Industries*, 430 U.S. at 477, 97 S.Ct. at 1302, the existence of a state law remedy, discussed *infra, see Blue Chip*, 421 U.S. at 738 n.9, 95 S.Ct. at 1927 n.9. The Texas remedies offer several advantages over the federal remedies. *See* Bateman, *Securities Litigation: The 1977 Modernization of Section 33 of the Texas Securities Act*, 15 Houston L.Rev. 839 (1978); Bordwine, *Civil Remedies Under the Texas Securities Laws*, 8 Houston L.Rev. 657 (1971); Comment, *Section 27:01: Alternative to Federal Securities Fraud Remedies*, 33 Sw. L.J. 703 (1979).

**25.** *See Ernst & Ernst*, 425 U.S. at 199, 212 14 & n.20, 96 S.Ct. at 1383, 1390 1391 & n.20; *supra* n.15.

**26.** *See Huddleston*, 640 F.2d at 547–48. Under *Huddleston*, conduct invoking Rule 10b–5(a) and (c) creates a presumption of reliance by the plaintiff, leaving to the defendant proof of nonreliance as an affirmative defense.

**27.** Wash sales are banned by § 9(a)(1)(A), matched orders by § 9(a)(1)(B) and (C).

**28.** The very language of § 9(a)(1) requires scienter (e.g., "effect any transaction," "enter any order ... with the knowledge"). In addition, subsection 9(e) applies to any person who "willfully participates" in an act or transaction violating § 9(a). *See* S.Rep.No. 792, 73d Cong., 2d Sess. 17 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17; H.R.Rep.No. 1383, 73d Cong., 2d Sess. 20 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 18; *United States v. Minuse*, 114 F.2d 36, 39 (2d Cir. 1940).

**29.** § 9(a).

**30.** The legislative history of § 9 erects a reliance requirement:

[T]he bill provides that any person who unlawfully manipulates the price of a security, or who induces transactions in a security by means of fraud or misleading statements ... shall be liable in damages to those who have bought or sold the security at prices affected by such violation or statement. In such case the burden is on the plaintiff to show the violation or the fact that the statement was false or misleading, and that he relied thereon to his detriment.

S.Rep.No. 792, 73d Cong., 2d Sess. 12-·13 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17.

(5) that affected plaintiff's purchase or selling price.[31]

#### c. *The Elements of Subsection 9(a)(2).*

■ In order to show a violation of subsection 9(a)(2) in a private suit under subsection 9(e), a plaintiff must plead and prove that (1) a series of transactions in a security creating actual or apparent trading in that security *or* raising or depressing the price of that security,[32] (2) carried out with scienter[33] (3) for the purpose of inducing the security's sale or purchase by others,[34]

31. § 9(e).

32. § 9(a)(2). It should be noted that § 9(a)(2)'s reach may be limited by SEC rules permitting manipulative activities for legitimate stabilizing purposes. *See, e.g.,* SEC Rule 10b 7, 17 C.F.R. § 240.10b–7 (1981). Prior to Rule 10b–7's adoption in 1955, courts had held that legitimate stabilizing activity during a stock distribution otherwise violative of § 9(a)(2) is not actionable. *See, e.g., Pergament v. Frazer,* 93 F.Supp. 13 (E.D.Mich.1950), *aff'd,* 203 F.2d 315 (6th Cir. 1953), *cert. denied,* 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953); *Stella v. Kaiser,* 82 F.Supp. 301 (S.D.N.Y.1948).

33. *See, e.g., Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 794 (2d Cir. 1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970), *on remand on other grounds,* 326 F.Supp. 766 (S.D.N.Y.1971), *rev'd on other grounds,* 490 F.2d 332 (2d Cir. 1973); *supra* n.28.

34. § 9(a)(2).

35. *See supra* n.30.

36. § 9(e).

37. § 9(a)(6).

38. *Id.* The SEC does not currently have any rules published exclusively under § 9, although several § 10(b) rules are promulgated either pursuant to both §§ 9 and 10(b) or pursuant to § 10 but covering § 9 activities. *See, e.g.,* Rules 10b 6, 7, 8, 13, 17 C.F.R. § 240.10b– 6, 7, 8, 13 (1981). Thus, reference must be had to those rules and any conditions they impose if a plaintiff is pursuing a § 9(a)(6) claim. However, none of those rules may be used to circumvent Congress' statutorily-imposed requirements as found in § 9(a)(6) and (e). *See infra* n.39.

39. The SEC has maintained that it can enact prophylactic rules, such as Rule 10b–6, which brand particular practices illegal *per se* without

(4) was relied on by the plaintiff,[35] (5) and affected plaintiff's purchase or selling price.[36]

#### d. *The Elements of Subsection 9(a)(6).*

■ To prove a violation of subsection 9(a)(6) in a private suit under subsection 9(e), a plaintiff is required to show (1) a series of transactions in a security[37] (2) made for the purpose of pegging, fixing, or stabilizing the price of that security in violation of SEC rules[38] (3) done with scienter[39] (4) on which the plaintiff relied[40] (5)

the necessity of proving scienter. *See* Brief of the SEC as *Amicus Curiae* in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), at 33 & n.*. However, *Ernst & Ernst* and *Aaron* have sharply circumscribed the SEC's power to enact such rules, since both held that the SEC cannot discard statutorily defined elements of a cause of action under Rule 10b–5. That the SEC's power is limited is particularly clear from *Aaron* where the Court would not allow negligence to suffice for injunctive relief under Rule 10b–5 when the statute required scienter.

Whatever the current status of SEC rules in SEC enforcement actions, to the extent that an SEC rule is the basis for an express private cause of action under § 9, that rule may not be used to defy the will of Congress as expressed in § 9(e) by discarding elements of that cause of action. An SEC rule cannot be used to make an end-run around the language and intent of a statute. *See Ernst & Ernst,* 425 U.S. at 213–14, 96 S.Ct. at 1391; *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 41, 45–46, 97 S.Ct. 926, 951, 51 L.Ed.2d 124 & n.27 (1977); *infra* text accompanying nn. 52–55. That Congress has created a scienter requirement for a private cause of action for violation of an SEC rule under § 9(a)(6) and (e) is clear beyond peradventure. *See supra* n.28. Indeed, the words "pegging, fixing, or stabilizing" are terms of art in the context of securities markets and their commonsense meaning connotes intentional or willful conduct. *Cf. Ernst & Ernst,* 425 U.S. at 197–99, 96 S.Ct. at 1382–1383 (word "manipulative" in § 10(b) held a term of art in securities market context connoting intentional or willful behavior).

Our conclusion is buttressed by the observation that Congress intended activities banned by, for instance, § 9(a)(1) (wash sales and matched orders) to be illegal in all situations, yet the very language of § 9(a)(1) requires scienter and any doubt about Congress' intent is removed by the scienter requirement in § 9(e) for private actions. *See* S.Rep.No. 792, 73d Cong., 2d Sess. 17 (1934), *reprinted in* 5

40. See note 40 on page 1165.

that affected plaintiff's purchase or selling price.[41]

e. *A Comparison of Rule 10b–5(a) and (c) and Subsections 9(a)(1), and (2), and (6).*

 We note several elements that make a violation of subsections 9(a)(1), (2), and (6) more difficult to prove than a violation of Rule 10b–5(a) and (c).

First, causation, as discussed previously, is much easier to prove under Rule 10b–5 than under section 9.[42] Second, under Rule 10b–5, recklessness can fulfill the scienter requirement. However, recklessness may not be used to fulfill section 9's scienter requirement, as we noted in our discussion of subsection 9(a)(4).[43] Third, while Rule 10b–5(a) and (c) create a presumption of reliance by the plaintiff that can be rebutted by the defendant, section 9 aids the plaintiff with no such presumption.[44] Fourth, and only as to subsection 9(a)(2), there is an intent to induce requirement not found in Rule 10b–5(a) and (c).

Rule 10b–5(a) and (c) therefore require no *additional* proof of facts creating a *higher* burden of proof when compared to subsections 9(a)(1), (2), and (6). In fact, Rule 10b–5(a) and (c) create a lower burden of proof.[45] Lacking a trade-off for this easing

of the burden of proof and accompanying enlargement of the plaintiff class,[46] we hold that permitting a verdict for Chemetron under a Rule 10b–5(a) and (c) implied action impermissibly nullifies Congress' deliberate and careful limitations on the express statutory remedy of subsections 9(a)(1), (2), and (6).[47]

4. Legislative History of the 1933 and 1934 Acts and the Proper Scope of Rule 10b–5.

Any doubts about the results reached under the *Huddleston* analysis are laid to rest by an analysis not undertaken in *Huddleston, Wachovia,* or *Ross*—the intent of Congress as revealed in the legislative history and structure of the 1933 and 1934 Acts. Reviewing that history and structure, we conclude that in the coherent and comprehensive scheme for controlling securities fraud that Congress established,[48] section 9 is the only remedy for the fraud in this case.

Section 9 is considered "[t]he very heart of the Act." SEC, *Report on Proposals for Amendments of the Securities Act of 1933 and the Securities Exchange Act of 1934,* H.R. Comm. Print, 77th Cong., 1st Sess. 50 (1941). With its procedural and substantive limitations, it takes aim at several specific

---

Ellenberger & Mahar, Item 18. To have it otherwise could, as Chief Judge Cardozo said long ago, render defendants liable "in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179–80, 174 N.E. 441, 444 (1931), *quoted in Ernst & Ernst,* 425 U.S. at 215 n.33, 96 S.Ct. at 1391 n.33.

40. *See supra* n.30.

41. § 9(e).

42. In the wake of *Shores v. Sklar,* 647 F.2d 462, 471 ·72 (5th Cir. 1981) (en banc), *petition for cert. docketed,* - U.S. ——, 102 S.Ct. 1424, 71 L.Ed.2d 646 (1981), proof of causation under Rule 10b–5(a) and(c) may be easier than it is under Rule 10b–5(b). If *Shores* so holds, and we express no opinion on this issue since we need not, our conclusion as to the relative burdens of proof under Rule 10b–5(a) and (c), and § 9(a)(1), (2), and (6) is reinforced.

43. *See supra* nn.15, 18.

44. *Shores* may also further reduce the plaintiff's burden of proof of reliance under Rule 10b–5(a) and (c) insofar as it permits reliance on the "integrity of the marketplace." *See* 647 F.2d at 471. If *Shores* is so interpreted, and we forbear from interpreting it thusly, our conclusion as to the relative burden of proof is reinforced.

45. *Accord,* 1 A. Bromberg & L. Lowenfels, *supra* n.22.

46. *See supra* n.23.

47. *See supra* n.24.

48. Judging by the comments of its own members, the Securities Exchange Act of 1934 is probably one of the better statutes in terms of coherence and thoroughness ever to emerge from Congress. *See, e.g.,* 78 Cong.Rec. 8164 (1934) (remarks of Sen. Fletcher).

types of stock manipulation schemes,[49] virtually all known and acknowledged to be harmful in 1934. In addition, section 9 gives the SEC rulemaking power to reach types of stock manipulation not known in 1934 or not proven harmful *per se* at that time. *See* § 9(a)(6), (b), and (c), 15 U.S.C. § 78i(a)(6), (b), and (c). However, Congress, in its legislative wisdom, laid down the limits on private liability under section 9. Neither private parties, the SEC, nor the courts may go around those limits, no matter how broad the rulemaking power appears, since the Supreme Court has made it clear that the "administration of a federal statute is not the power to make law." *Ernst & Ernst*, 425 U.S. at 213, 96 S.Ct. at 1391; *see Aaron*, 446 U.S. at 691, 100 S.Ct. at 1952; *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41 n.27, 97 S.Ct. 926, 949 n.27, 51 L.Ed.2d 124 (1977). Equally obvious is that a rule promulgated under section 10(b) cannot be used to evade section 9. *See Piper*, 430 U.S. at 45–47, 97 S.Ct. at 951–952.

That Congress was very concerned about the scope of section 9 is evidenced by its meticulous drafting, legislative history, and the massive investigation that led to it. *See, e.g.,* S.Rep.No.1455, 73d Cong., 2d Sess. 54–55 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 21 (known as the Fletcher Report); H.R.Rep.No.1383, 73d Cong., 2d Sess. 10–11 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 18. To nullify section 9 by implication would violate the "cardinal principle of construction that repeals by implication are not favored." *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). This principle and Congress' great care from investigation through final passage militates against nullification of section 9 by implication without an express desire by Congress to do so. *See Ernst & Ernst*, 425 U.S. at 210–11, 96 S.Ct. at 1389; Ruder, *Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?* 57 Nw.L. Rev. 627, 649 (1963).

Not only is such clear intent of nullification absent from section 10(b)'s legislative history, but that history demonstrates the opposite—that section 10(b) was never intended to supplant or traduce the remedies and limitations of section 9 or the other express remedies of the 1933 and 1934 Acts. From its inception through various amendments and into its final form, section 10(b) was always intended as a "catchall" provision to reach activities not covered or anticipated in other provisions of the Acts.

In House committee hearings, Thomas Corcoran, an official of the Roosevelt administration who assisted in the drafting of the Act, described the provisions of section 9(c), the forerunner of section 10(b), in these terms:

> Subsection (c) says, "Thou shalt not devise *any other* cunning devices" . . . . Of course subsection (c) is a *catch-all clause* to prevent manipulative devices. I do not think there is any objection to that kind of a clause. The Commission should have the authority to deal with *new manipulative devices.*

*Stock Exchange Regulation, Hearings Before the House Comm. on Interstate and Foreign Commerce*, 73d Cong., 2d Sess. 115 (1934), *reprinted in* 8 Ellenberger & Mahar, Item 23 (emphasis added). J. M. Landis, FTC Commissioner and one of the Act's draftsmen, substantiated this interpretation of section 10(b): "[I]t gives the general power to the Commission to prescribe rules and regulations governing *any other manipulative devices.*" *Id.* at 21, *reprinted in* 8 Ellenberger & Mahar, Item 23 (emphasis added).[50]

---

**49.** "Wash sales" are banned by § 9(a)(1)(A), "matched orders" by § 9(a)(1)(B) and (C), market operations by § 9(a)(2), "prophecies" by § 9(a)(3) and (5), false and misleading statements by § 9(a)(4), pegging, fixing, or stabilizing securities prices by § 9(a)(6), and "puts," "calls," "straddles," "options," and "privileges" by § 9(a)(6), (b), (c), and (d).

**50.** As comments made by "persons responsible for the preparation or the drafting of [the] bill," *Ernst & Ernst*, 425 U.S. at 203 n.24, 96 S.Ct. at 1386 n.24, during cross-examination by and comment from a congressional committee, *see Piper*, 430 U.S. at 31 & n.20, 97 S.Ct. at 944 & n.20, the views of Messrs. Corcoran and Landis are of considerable weight. *See* 2A C. D.

The report of the Senate committee which studied the proposed bill summarized section 10(b) as follows: "Subsection (b) authorizes the Commission by rules and regulations to prohibit or regulate the use of *any other manipulative or deceptive practices which it finds detrimental to the interests of the investor.*" S.Rep.No.792, 73d Cong., 2d Sess. 18 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 17 (emphasis added). Finally, Senator Fletcher, the Senate sponsor of the Act, declared in the floor debates that section 10(b) gave the SEC "power to forbid *any other* devices." 78 Cong.Rec. 2271 (1934) (emphasis added).

In line with the catchall purpose of section 10(b), the conference committee broadened the SEC's rulemaking power to include protection of the public interest, as well as protection of investors. H.R.Conf. Rep.No.1838, 73d Cong., 2d Sess. 32–33 (1934), *reprinted in* 5 Ellenberger & Mahar, Item 20. The Supreme Court and this circuit have consistently interpreted section 10(b) as a catchall. *See, e.g., Aaron,* 446 U.S. at 690, 100 S.Ct. at 1952; *Ernst & Ernst,* 425 U.S. at 203, 96 S.Ct. at 1385; *Herpich v. Wallace,* 430 F.2d 792, 801 (5th Cir. 1970).

From this power to enact catchall rules under section 10(b) came Rule 10b–5. Judge Ainsworth, in his thorough and scholarly opinion in *Herpich,* captured the precise origins and original purpose of the Rule:

The SEC adopted Rule 10b–5 in 1942 *to close a "loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase."* SEC Sec.Exch.Act Rel.No.3230 (May 21, 1942). The purpose of the rule, it seems clear, was to afford sellers of securities the same protections already afforded purchasers by the federal scheme of securities regulation. Previously, fraud on sellers, as distinct from fraud on purchasers, *see* Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a), was not covered by the

securities acts unless committed by an over-the-counter broker or dealer. 8 SEC Ann.Rep. 10 (1943); *see* Securities Exchange Act of 1934, § 15(c), 15 U.S.C. § 78o(c). Viewing the rule as an "additional protection to investors," 8 SEC Ann.Rep. 10 (1943), *the Commission fashioned it to "make applicable to the purchase of securities, the same broad antifraud provisions which the Congress has imposed in Section 17(a) of the Securities Act of 1933, in connection with the sale of securities."* Ward La France Truck Corp., 13 S.E.C. 373, n.8 (1943). To accomplish this end the Commission ... copied the language of section 17(a) of the Securities Act ... and applied it "in connection with the purchase or sale of any security," this being the reach of section 10(b). *See also Birnbaum v. Newport Steel Corp.,* 2 Cir., 1952, 193 F.2d 461, 463; 3 and 6 Loss, Securities Regulation 1424–1427 (2d ed. 1961), 3617 (Supp. 2d ed. 1969).

430 F.2d at 801–02 (emphasis added); *accord, Ernst & Ernst,* 425 U.S. at 212 n.32, 96 S.Ct. at 1390 n.32.

In 1946, four years after the adoption of Rule 10b–5, came the landmark decision by Judge Kirkpatrick that there existed an implied private right of action under the Rule. *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). The Supreme Court subsequently acquiesced in this judicial implication. *Touche Ross,* 442 U.S. at 577 n.19, 99 S.Ct. at 2490 n.19.

Judge Kirkpatrick confronted a novel issue again in 1948, one apposite to our case. In *Rosenberg v. Globe Aircraft Corp.,* 80 F.Supp. 123 (E.D.Pa.1948), plaintiffs asserted a Rule 10b–5 claim that duplicated the coverage of sections 11 and 12 of the 1933 Act, 15 U.S.C. §§ 77k, 77*l.* His resolution of this conflict between the express and implied remedies is worth quoting:

It cannot be supposed that Congress intended to abolish [the] regulations and limitations [of §§ 77k and 77*l*] when it enacted Sec. 10 of the Act of 1934. By any reasonable rule of statutory interpre-

Sands, *Sutherland Statutory Construction* § 48.06, at 203 (4th ed. 1973).

tation, it would require either an express repeal or an implication of repeal so strong as to be inescapable. The two Acts are unquestionably in pari materia and must be construed together to make a consistent whole. Looking at them as one statute it is simply not possible that Congress, having prescribed in elaborate detail procedural requirements which must be fulfilled in order to enforce civil liability attaching to a carefully defined type of violation, would have casually nullified them all in a later section. Nor can an intention to do so be deduced from the general provisions of Sec. 29 of the Act of 1934, 15 U.S.C.A. § 78bb, which is, "The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity . . . ." As a matter of fact "this chapter" does not provide any remedies for the violation of Sec. 10(b). Those remedies arise by the general law of torts, which attaches civil liability to the violation of a criminal statute. The point in *Kardon v. National Gypsum Co.*, D.C., 69 F.Supp. 512, was not that the Act itself provided a civil remedy, but that there was nothing in it to indicate that Congress intended to withhold from injured parties the right to recover damages which normally attends violations of a criminal statute. Undoubtedly "The rights and remedies provided by this chapter" referred to in Sec. 29 were intended to be the rights and remedies which the Act of 1934 did, in Sec. 9, 16 and 18, 15 U.S.C.A. §§ 78i, 78p and 78r, expressly provide for violations of those sections. No other interpretation can avoid making a completely incongruous piece of legislation out of the two statutes in question.

80 F.Supp. at 124–25; *accord, Ernst & Ernst*, 425 U.S. at 210–11, 96 S.Ct. at 1389. Judge Kirkpatrick thereupon held that the suit under Rule 10b–5 would be *subject to the restrictions of the express remedies that applied.* 80 F.Supp. at 124–25. Thus the plaintiffs could not evade the restrictions of the express remedies by pleading Rule 10b–5.[51]

The reasoning of Judge Kirkpatrick in *Rosenberg* has been applied by two recent Supreme Court opinions, *Blue Chip* and *Piper.* In *Blue Chip*, the Court held that to acquire standing under Rule 10b–5, private plaintiffs must be either purchasers or sellers of securities, the so-called *Birnbaum* rule.[52] This holding relied in part on the principle that "[i]t would indeed be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." 421 U.S. at 736, 95 S.Ct. at 1925.

In *Piper*, the Supreme Court was confronted with a claim that the *Birnbaum* rule applies to plaintiffs pursuing private remedies under Rule 10b–6.[53] The Court, however, decided the standing issue on a narrower ground, holding that a frustrated tender offeror has no Rule 10b–6 cause of action against the successful offeror based solely on a failure to gain control. 430 U.S. at 45, 97 S.Ct. at 951. Alternatively, the SEC as *amicus curiae* argued that a private plaintiff relying on Rule 10b–6 can avail itself of section 9(e)'s standing requirement

**51.** To like effect is another early case, *Montague v. Electronic Corp. of America*, 76 F.Supp. 933, 936 (S.D.N.Y.1948), where the court concluded that "Section 10(b) . . . and Rule X–10B–5 were clearly not intended to supplant Section 11 of the 1933 Act." In so holding, the court observed:

> The settled rule of statutory construction is that, where there is a special statutory provision affording a remedy for particular specific cases and where there is also a general provision which is comprehensive enough to include what is embraced in the former, the special provision will prevail over the general provision, and the latter will be held to apply

only to such cases as are not within the former.

*Id.* (citations omitted); *see* In re Bache & Co., [1972–73 Transfer Binder] Fed.Sec.L.Rptr. (CCH) ¶ 93,571 (§ 9 exclusive remedy for activities it covers, no Rule 10b–5 coverage) (N.Y. Sup.Ct.1972).

**52.** The rule is named after the case in which it originated, *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

**53.** SEC Rule 10b–6, 17 C.F.R. § 240.10b–6 (1981).

(the purchase or sale of "any security") since Rule 10b–6 is grounded in part in section 9. If that is true, the Supreme Court reasoned, the plaintiff must also meet the other section 9(e) standing requirements.[54] Since the plaintiff failed to meet section 9(e)'s "affected price" criterion, there was no section 9 standing. A party may not selectively pick and choose among the requirements, depending on whether they aid his case. *See* 430 U.S. at 45–46, 97 S.Ct. at 951.

From *Piper*, we conclude that a private plaintiff pursuing an implied remedy is bound by the congressional limits on the express remedy from which it is derived. From *Blue Chip*, we derive a similar principle: implied remedies are limited by the provisions of comparable express remedies.

Despite the legislative history of sections 9 and 10(b) that underlies the *Rosenberg-Blue Chip-Piper* principles limiting implied remedies, courts have permitted private plaintiffs to use rules promulgated under section 10(b) to reach section 9 activity without imposing section 9's restrictions. *See, e.g.*, cases cited *supra* note 9.

This is such a case. Section 9 encompassed this scheme. Yet relief was granted under Rule 10b–5, defying the intent of Congress as revealed in the legislative history of the Acts. From that history, "we are compelled to conclude that Congress provided precisely the remed[y] it considered appropriate." *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 15 (1981). Thus the correct response to attempts such as this to evade section 9 is that pioneered by *Rosenberg* and endorsed in *Blue Chip* and *Piper*: if the action is styled as one under Rule 10b–5, yet addresses section 9 activities, section 9's limitations should apply.[55] Rule 10b–5 has been extended well beyond its gap-filling purpose as originally envisioned by Congress in section 10(b) and proposed by the SEC. In their eagerness to improve upon the statutory scheme, a practice condemned by the Supreme Court, the courts have created law that does not follow congressional intent, which is the "ultimate question" in these cases. *See Touche Ross*, 442 U.S. at 578, 99 S.Ct. at 2490; Ruder, *supra* note 55, at 628. In this case, Rule 10b–5 has been extended until it cuts out the heart of the 1934 Act, section 9, thereby crossing the line between administration of a congressional statute and making new law unauthorized by Congress.

### 5. Conclusion

Because we have found that permitting a Rule 10b–5 remedy here would impermissibly nullify the section 9 remedy and is "unnecessary to ensure the fulfillment of Congress' purposes" in enacting the 1934 Act, *Santa Fe Industries*, 430 U.S. at 477, 97

---

**54.** The SEC urged this position on the Court. *See* Brief of the SEC as *Amicus Curiae, supra* note 39, at 191–94.

**55.** *Accord*, Ruder, *Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?*, 57 Nw.L.Rev. 627, 660, 685 (1963).

We recognize that Rule 10b–5 was not expressly promulgated pursuant to § 9 as was Rule 10b–6 in *Piper. Compare* Rule 10b–5, SEC Exch.Act Rel. No. 3230 (1942), *reprinted in* A. Bromberg & L. Lowenfels, *supra* n.21, at app. B (Rule promulgated "pursuant to authority conferred upon [SEC] by the Securities Exchange Act of 1934, particularly Sections 10(b) and 23(a) thereof") *with* Rule 10b–6, SEC Exch.Act Rel. No. 5194 (1955), *reprinted in* [1952–56 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 76,350 (Rules 10b–6, –7, and –8 promulgated "pursuant to the provisions of the Securities Exchange Act of 1934, particularly Sections 3(b), 9(a)(6), 10(b) and 23(a) thereof").

However, since the SEC may administer the securities laws only in conformance with congressional intent, *see Aaron*, 446 U.S. at 691, 100 S.Ct. at 1952; *Piper*, 430 U.S. at 41 n.27, 97 S.Ct. at 949 n.27; *Ernst & Ernst*, 425 U.S. at 213–14, 96 S.Ct. at 1391, it may not "make law" by promulgating rules that avoid the limitations of comparable express private remedies, *see Blue Chip*, 421 U.S. at 736, 95 S.Ct. at 1925. Thus, the mere fact that 40-year-old Rule 10b–5 was not expressly promulgated pursuant to § 9 while more recent rules such as 10b–6, –7, and –8 were, does not alter the logic of *Rosenberg, Blue Chip*, and *Piper.* Nor does it prevent us from attaching § 9 limits to Rule 10b–5 when it is stretched far beyond its "modest aims and origins" ("closing an unforeseen loophole") to "extend a private right of action ... to those whom Congress excluded from the express civil remedies ... to cover such a violation," *Blue Chip*, 421 U.S. at 736 n.8, 95 S.Ct. at 1926 n.8.

S.Ct. at 1302, we reverse the trial court's judgment insofar as it was based on Rule 10b–5 and remand for dismissal of the federal claims.[56]

### B. Texas Securities Law Claims.

Chemetron alleged violations of article 4004, Tex.Rev.Civ.Stat. (Vernon 1966).[57] On appeal, several claims of error are made against the trial court's judgment based on art. 4004.

#### 1. Errors in the Submission of Special Interrogatories and Instructions.

##### a. *Special Interrogatories.*

 Appellants assert that the trial court erroneously failed to submit or submitted faulty special interrogatories on three elements of an article 4004 claim: (1) duty to disclose, (2) intent to induce action, and (3) material inducement. Further, appellants claim that it was error not to submit a separate interrogatory requesting exemplary damages as to each appellant. Chemetron initially rejoins that appellants' failure to request or object to the special interrogatories submitted below waives a jury trial on those issues under Fed.R.Civ.P. 49(a),[58] citing *Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781, 796 (5th Cir. 1973); *John R. Lewis, Inc. v. Newman*, 446 F.2d 800, 804–05 (5th Cir. 1971); and *First National Bank, Henrietta v. SBA*, 429 F.2d 280, 285 (5th Cir. 1970).

---

**56.** Because we deny Chemetron's cross-appeal of the trial judge's (1) denial of a directed verdict and judgment notwithstanding the verdict regarding Special Interrogatory No. 6 (the answer to which foreclosed § 9 relief because the jury found that the scheme had not "affected" the price it paid for its Westec stock) and (2) denial of a federal securities law claim arising out of its 1969 sale of its Westec stock to the bankruptcy trustee, *see infra* section IV, we pretermit discussion of numerous other issues raised on appeal insofar as they are directed at the federal securities law claims.

**57.** Former Tex.Rev.Civ.Stat.Ann. art. 4004 (Vernon 1966) (reenacted as Tex.Bus. & Comm. Code § 27.01 (Vernon 1968), *see supra* n.4, declared:

> Actionable fraud in this State with regard to transactions in real estate or in stock in corporations or joint stock companies shall consist of either a false representation of a past or existing material fact, or false promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract. Whenever a promise thus made has not been complied with by the party making it within a reasonable time, it shall be presumed that it was falsely and fraudulently made, and the burden shall be on the party making it to show that it was made in good faith but was prevented from complying therewith by the act of God, the public enemy or by some equitable reason. All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract. All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons wilfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered.

**58.** Rule 49(a) provides:

> Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. *If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issues so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.*

(emphasis added).

We see no merit in this claim. In this circuit, a party preserves a claim of error either by proposing and being denied a special interrogatory or by objecting to a proposed special interrogatory before the jury has retired. *See Huddleston*, 640 F.2d at 550. *John R. Lewis, Fredonia*, and *Henrietta* are not to the contrary. Either method serves the ultimate purpose of directing the trial court's attention to the issue. The preferred method is to assist the trial court by proposing special interrogatories, but failure to do so is not fatal so long as a timely, comprehensible objection is made before submission to the jury. *See id.* A final requirement is that each party desiring to preserve the claim of error must object. *See L'Urbaine et la Seine v. Rodriguez*, 268 F.2d 1, 4 (5th Cir. 1959). Our examination of the record indicates that all appellants preserved their claims of error with timely objections.[59]

We turn now to the asserted errors.

Rule 49(a) allows special verdicts at the discretion of the trial court. The trial court also has discretion over the nature and scope of the issues submitted, a discretion reviewable only for abuse. *Loffland Brothers Co. v. Roberts*, 386 F.2d 540, 546 (5th Cir. 1967), *cert. denied*, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968). The criteria used in appellate evaluation of the adequacy of special interrogatories are:

> (i) whether, when read as a whole and in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury; (ii) whether the submission of the issues to the jury was "fair"; and (iii) whether the "ultimate questions of fact" were clearly submitted to the jury.

*Dreiling v. General Electric Co.*, 511 F.2d 768, 774 (5th Cir. 1975) (citations omitted).

We apply these criteria in light of several holdings that clarify their meaning. "[T]he judge must submit all material issues raised by the pleadings and the evidence," *Simien v. S. S. Kresge Co.*, 566 F.2d 551, 555 (5th Cir. 1978),[60] although none must be submitted twice through redundant special interrogatories, *Angelina Casualty Co. v. Bluitt*, 235 F.2d 764, 770 (5th Cir. 1956). The limits on the submission requirement were recently outlined:

> There is no doubt that a judge must clearly and properly instruct the jury with regard to the resolution of key issues in a given case. However, there is no basis for [appellant's] apparent assumption that because an issue is important to the outcome of a case, the jury must be instructed to supply a specific answer informing the court how they resolved that one issue. No party is entitled to a special verdict on each of the multi-faceted, multitudinous issues essential to the resolution of a given case.

*Miley v. Oppenheimer & Co.*, 637 F.2d 318, 334 (5th Cir. 1981).

Guided by these holdings, we turn to the law of fraud in Texas. Each of the following elements must be established in order to permit recovery: (1) the charged party made a false material representation that consisted of either a positive untrue statement of material fact, concealment of a material fact, or nondisclosure of a material fact that the charged party had a duty to disclose; (2) the charged party knew that the material representation was false or made it recklessly without any knowledge of its truth; (3) the charged party made the false material representation with the intent that it should be acted upon by the charging party; (4) the charging party acted in reliance thereon; and (5) the charging

---

**59.** After the reading of the instructions to the jury and its retirement, the trial judge entertained objections on the record to the instructions. Counsel for Chemetron proposed that all counsel file objections at a later time. The trial court agreed, as did counsel for BFI on behalf of all defendants.

All defendants subsequently filed timely objections to the instructions and interrogatories that covered all of their points on appeal. These objections repeated those made at an off-the-record charge conference in chambers before submission to the jury.

**60.** Thus the *Huddleston* court, for instance, found that reliance and causation were contested material issues in a Rule 10b–5 case and required their submission. 640 F.2d at 549–50.

party thereby suffered an injury. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142–43 (Tex.1974); *Roland v. McCullough*, 561 S.W.2d 207, 210 (Tex.Civ.App.—San Antonio 1977, writ ref'd n. r. e.); *Moore & Moore Drilling Co. v. White*, 345 S.W.2d 550, 555 (Tex.Civ.App. —Dallas 1961, writ ref'd n. r. e.).

■ Appellants first assert that this was only a case of nondisclosure, and hence it was error not to submit a special interrogatory on the duty to disclose.[61] Chemetron responds that this was a case involving only concealment or positive untrue statements, and therefore the duty to disclose does not apply. Our examination of the record indicates that while concealment or positive untrue statements may have been issues in this case, nondisclosure was the only type of misrepresentation under Texas law submitted to the jury.[62] Since nondisclosure was the only basis for liability under Texas law, the existence of a duty to disclose was a material issue. However, a duty to disclose arises only in particular circumstances. This court has held that "Texas law is clear that if there is no confidential or fiduciary relation between the parties [creating a duty to disclose], mere silence does not amount to fraud or misrepresentation." *Southwest E & T Suppliers, Inc. v. American Enka Corp.*, 463 F.2d 1165, 1166 (5th Cir. 1972).

Chemetron cites several Texas cases in which nonfiduciary relationships have been held to create a duty to disclose, *see, e.g., Campbell v. Booth*, 526 S.W.2d 167, 172 (Tex.Civ.App.—Dallas 1975, writ ref'd n. r. e.); *Chandler v. Butler*, 284 S.W.2d 388, 394 (Tex.Civ.App.—Texarkana 1955, no writ), or where "active" concealment was actionable without there being a duty to disclose, *see, e.g., Campbell*, 526 S.W.2d at 172; *Crofford v. Bowden*, 311 S.W.2d 954, 956–57 (Tex.Civ.App.—Fort Worth 1958, writ ref'd). The latter cases are inapposite since concealment was not submitted to the jury here. As to the former cases, *Southwest E & T Suppliers* held that the Texas law of fraud permitted no exceptions to the above-quoted rule. *See* 463 F.2d at 1166. "Once a panel of this Court has settled on the state law to be applied in a diversity case, the precedent should be followed by other panels . . . absent a subsequent state court decision or statutory amendment which makes this Court's decision clearly wrong." *Lee v. Frozen Food Express, Inc.*, 592 F.2d 271, 272 (5th Cir. 1979) (per curiam). Chemetron has cited to us only one Texas case—*Campbell*—decided since *Southwest E & T Suppliers* that broadens the rule it announced. Without more, this single intermediate appellate opinion, which rests on reasoning that the Texas Supreme Court refused to adopt, *see* Tex.R.Civ.P. 483 (West 1980), is insufficient to persuade us

---

**61.** The premise underlying this assertion is that the existence of a duty to disclose is always a jury issue. This premise is not valid in all cases. The existence of such a duty depends on whether there is a fiduciary or confidential relationship between the parties, which is usually a question of fact for the jury. *See, e.g., Schiller v. Elick*, 240 S.W.2d 997, 999 (Tex. 1951). *But see* Keeton, *Fraud—Concealment and Non-Disclosure*, 15 Tex.L.Rev. 1, 39–40 (1936) (arguing that duty to disclose should always be a question for the judge). However, certain relationships have been held to be fiduciary or confidential as a matter of law and can be withdrawn from jury consideration: attorney-client, trustee-cestui que trust, and so forth. *See Trevino v. Sample*, 565 S.W.2d 93, 96 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r. e.). The existence of other kinds of fiduciary or confidential relationships is apparently still a question of fact, but Texas law may be in flux and may be moving in the direction urged by

Dean Keeton. *Compare Schiller*, 240 S.W.2d at 999 (fiduciary relationship a question of fact), *with Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507–09 (Tex.1980) (four-justice plurality opinion arguably creating fiduciary relationship between family members as a matter of law). Despite the state of the law in Texas, Chemetron cites no authority creating a fiduciary or confidential relationship and its concomitant duty to disclose here as a matter of law. Therefore, we accept appellants' premise.

**62.** Special Interrogatory No. 20, upon which liability under Texas law is premised, asked: "Do you find from a preponderance of the evidence that at the time and the occasion of Chemetron's purchase of Western Equities stock on January 14, 1966, that there was *no disclosure* to Chemetron of said plan, scheme or conspiracy?" (emphasis added).

that *Southwest E & T Suppliers* is "clearly wrong."

Thus, silence alone by the defendants in this case does not create liability. Premising liability on the jury's affirmative answer to Special Interrogatory No. 20 was error without a jury finding that a confidential relationship existed.

The jury instructions on Texas law did not cure the failure to submit a special interrogatory that addressed some factual predicate of a duty to disclose. They simply stated that liability is created for "an omission or concealment of material fact by a person with a duty to disclose." There was no explanation of the duty, when it arises, how it is discharged, and so forth. The jury could not reasonably have made the required threshold finding of a factual basis for a duty to disclose before answering Special Interrogatory No. 20. It was not instructed to do so, nor was Special Interrogatory No. 20 cast in such form as to require one. Therefore, either a special interrogatory concerning the basis of the defendants' duty to disclose to Chemetron should have been submitted to the jury, or Special Interrogatory No. 20 should have addressed it, since it was a material issue. We need not and do not express any opinion on whether the defendants had such a duty here. We hold only that such an issue should have been submitted to the jury. On remand, if liability under Texas law is submitted to the jury based solely or in part on nondisclosure, Chemetron must prove the existence of a confidential relationship under the law of Texas as we interpreted it in *Southwest E & T Suppliers.*

■ Appellants also challenge the failure of the trial court to submit a special interrogatory on their intent to induce action by Chemetron. Chemetron argues that this element is established by taking the instructions and interrogatories as a whole. Hence it would have been needlessly redundant to submit a special interrogatory on this issue. In so arguing, Chemetron claims that this element is necessarily part of the alleged manipulative scheme directed at the investing public at large, which included Chemetron.

While Special Interrogatory No. 1 covered the issue of intent to induce action by the public at large,[63] Texas law clearly requires an intent to induce action by the plaintiff for article 4004 liability. *Oilwell Division, United States Steel Corp. v. Fryer,* 493 S.W.2d 487, 491 (Tex.1973). Thus, the trial court failed to submit to the jury a material issue—the defendants' intent to induce action *by Chemetron.* Appellants' claim of error is well taken.[64]

■ Appellants' third attack on the special interrogatories complains of the burden of proof placed on them in Special Interrogatory No. 25 on material inducement, which stated in full:

### DEFENDANTS' BURDEN
### SPECIAL INTERROGATORY NO. 25

Do you find from a preponderance of the evidence that Chemetron's decision to purchase Westec securities in January, 1966 would have been the same decision if all transactions comprising the scheme, plan or conspiracy to manipulate had been disclosed to Chemetron prior to the purchase?

The jury answered "no."

Our review of this issue requires some explanation of the instructions and special

---

**63.** Special Interrogatory No. 1 asked:

Do you find from a preponderance of the evidence that during the period September 2, 1964 through August 25, 1966, James W. Williams, directly or indirectly, alone or with others, participated in a plan or scheme to manipulate the stock of Western Equities by effecting a series of transactions in the stock of Western Equities, creating actual or apparent active trading in or raising the price of Western Equities stock for the *purpose of*

*inducing the purchase or sale of such stock by others*?
(emphasis added).

**64.** Special Interrogatory No. 1 is not defective in what it does—ask the jury whether there was a scheme or conspiracy. But as our discussion of Texas law *infra* reveals, the existence of a civil conspiracy alone does not create liability under art. 4004: at least one of the conspirators must specifically defraud the plaintiff.

interrogatories used by the trial court. The jury was correctly instructed that Chemetron had the burden of proving its contentions.[65] However, since conspiracy was also alleged, the defendants could avail themselves of the defense of withdrawal from any such conspiracy. The jury was correctly instructed that the defendants had the burden of proof on this defense.[66] As the burden moved back and forth throughout the 31 special interrogatories, the phrases "PLAINTIFF'S BURDEN" (abbreviated "PB" for our discussion here) or "DEFENDANTS' (or DEFENDANT'S) BURDEN" ("DB") were used to tell the jury when there was a change in the burden of proof. Thus, PB is found at the top of the first page of interrogatories. DB precedes Special Interrogatory No. 9 on Austin's withdrawal, but PB reasserts itself before Special Interrogatory No. 10. DB reappears before Special Interrogatory No. 15 on BFI's withdrawal but gives way to PB on Special Interrogatory No. 16. DB's next and final appearance before Special Interrogatory No. 25 is the one attacked here.[67] PB appears again before Special Interrogatory No. 26.

Under *Erie*, burden of proof is a substantive issue governed by state law in a diversity case such as this. *See* 9 C. Wright & A. Miller, *Federal Practice & Procedure* §§ 2405 and 2409 (1971). Under Texas law the burden of proof for every element in an action for fraud is on the plaintiff. *Brooks v. Parr*, 507 S.W.2d 818, 819 (Tex.Civ.App.—Amarillo 1974, no writ). Thus, Special Interrogatory No. 25 erroneously placed the burden of proof on the defendant.

This court cannot assume that the jury realized that the burden of proof in Special Interrogatory No. 25 was erroneous and therefore ignored it. The trial court had established a clear written pattern for the jury to follow when deliberating, and it is reasonable to believe that they did so despite what their verbal instructions had been. *See Cann v. Ford Motor Co.*, 658 F.2d 54, 59 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982). Thus, the jury instructions cannot cure this error.

However, it is clear from the record evidence of a massive manipulative scheme that the jury would have answered a special interrogatory stating the correct burden of proof the same way. Given the scale of this scheme, no reasonable corporate investor would have behaved as Chemetron did if it knew about the scheme, and no reasonable juror could have reached a different conclusion. Therefore, the improper placement of the burden of proof here is not reversible error. *See Sheppard Federal Credit Union*

---

**65.** *Burden of Proof*

Plaintiff has the burden of proving its contentions by a preponderance of the evidence taking into account the evidence, both direct and circumstantial, and the testimony of witnesses that you have heard.

It is important now that you understand what preponderance of the evidence means. It means to prove that something is more likely so than not so. It is the greater weight of the believable evidence. If upon any question submitted to you, you should find that the evidence is equally balanced, then the plaintiff has not sustained its burden of proof by a preponderance of the evidence on that question. It does not mean that you have to believe the side with the most witnesses, but it means that you should weigh all the testimony which, when considered and compared with the testimony opposed to it, has the most convincing force and produces in your minds a belief that what is sought to be proved is more likely true than not true.

Jury Instruction No. 11.

**66.** The court's instruction on this issue declared:

*Withdraw*

In connection with the term "withdraw" or "withdrew" or "withdrawal" from a conspiracy as used in this case, you are instructed that a person withdraws from a conspiracy if he engages in affirmative acts inconsistent with the object of the conspiracy, that is to say acts which disavow or defeat the purpose of the conspiracy, and by communicating the abandonment in a manner reasonably calculated to reach co-conspirators. Because withdrawal is a defense, the burden of proving "withdrawal from a conspiracy" is on the defendants.

Jury Instruction No. 27.

**67.** There is no special interrogatory on Bintliff's withdrawal.

*v. Palmer*, 408 F.2d 1369, 1372 (5th Cir. 1969).[68]

■ Appellants' final complaint about the special interrogatories is the failure to submit one that required the jury to apportion exemplary damages among them.[69] Since there is no Texas jurisprudence squarely on point, we are *Erie*-bound to make an "educated guess" as to how the Texas Supreme Court would rule. *See Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 214–15 (5th Cir. 1980). Before making this "educated guess," we must explain this issue further so that it can be properly analyzed.

The purposes of exemplary damages are the punishment of an intentional act by a defendant and the deterrence of future misbehavior. *See Pace v. McEwen*, 574 S.W.2d 792, 801 (Tex.Civ.App.—El Paso 1978, writ ref'd n. r. e.); *Collins v. Miller*, 443 S.W.2d 298, 302 (Tex.Civ.App.—Austin 1969, writ ref'd n. r. e.). Therefore, art. 4004 requires willfulness or knowledge on the part of the defendants before exemplary damages are permitted.[70]

In Special Interrogatory No. 26, the jury applied article 4004's willfulness or knowledge requirement to each defendant:

If you have found that a scheme or plan to manipulate the stock of Western Equities existed in answer to Special Interrogatory No. 1, *or* if you have found that a conspiracy existed in answer to Special Interrogatory No. 7, *and* if you have found that the existence of that plan, scheme or conspiracy was a material fact which was not disclosed to Chemetron in answer to Special Interrogatories 20 and 22, do you find from a preponderance of the evidence that any of the defendants *willfully concealed* the existence of such material fact or *knowingly took advantage* of said activity?

Answer by naming said defendants, if any.

| | | |
|---|---|---|
| Business Funds, Inc. | Yes ____ | No ____ |
| John F. Austin, Jr. | Yes ____ | No ____ |
| David C. Bintliff | Yes ____ | No ____ |
| Brazos Valley Cotton Oil Company | Yes ____ | No ____ |

**68.** We stress that this holding relies *on the record in this case.* The evidence as to the *extent of the transactions comprising the scheme* is clear, and that is the *sole* issue in Special Interrogatory No. 25. We intuit no view here on the sufficiency of the evidence on *liability* for the scheme.

In the vast majority of cases, the evidence will not be as clear as it was here, and an incorrect placement of the burden of proof will mandate reversal. *See Connecticut General Life Ins. Co. v. Breslin*, 332 F.2d 928, 934 (5th Cir. 1964).

**69.** Special Interrogatory No. 31 on exemplary damages lumped all the defendants together: "What sum of money, if any, if now paid in cash, do you find from a preponderance of the evidence that plaintiff Chemetron is entitled to as exemplary damages?" Appellants complain of the use of the phrase "entitled to" because it may improperly imply that the purpose of exemplary damages is compensation for the plaintiff instead of punishment for the defendants. *See Courtesy Pontiac, Inc. v. Ragsdale*, 532 S.W.2d 118, 122 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.). However, the use of this phrase, in and of itself, is not reversible error so long as "whether, when read as a *whole and in* conjunction with the general charge the interrogator[y] adequately present[s] the contested issue[ ] to the jury." *Dreiling*, 511 F.2d at 774. We review the use of this phrase in conjunction with the instructions

on exemplary damages *infra* and note here only that while the phrase should not be used because of its possible misleading implications, its use does not constitute reversible error *per se*, since Texas appellate opinions have often held persons "entitled to" exemplary damages. *See, e.g., Wise v. Pena*, 552 S.W.2d 196, 202 (Tex.Civ.App.—Corpus Christi 1977, writ dism'd); *Irwin v. Whirley*, 538 S.W.2d 150, 152 (Tex.Civ.App.—Waco 1976, no writ); *Briggs v. Rodriguez*, 236 S.W.2d 510, 516 (Tex.Civ.App.—San Antonio 1951, writ ref'd n.r.e.).

**70.** Art. 4004 declares:

[A]ll persons *wilfully making* such false representations or promises or *knowingly taking advantage* of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered.

(emphasis added). As reenacted in Tex.Bus. & Comm.Code § 27.01(c) (Vernon 1968), these requirements are maintained:

A person who *willfully makes* a false representation or false promise, and a person who *knowingly benefits* from a false representation or false promise, commit the fraud described in Subsection (a) of this section and are liable to the person defrauded for exemplary damages not to exceed twice the amount of actual damages.

(emphasis added).

(emphasis added). In response, the jury held BFI, Austin, and Bintliff each to have willfully concealed or knowingly taken advantage of the scheme. Chemetron claims that this finding fulfills article 4004's requirement and justifies the joint and several liability for punitive damages imposed in Special Interrogatory No. 31.

We disagree for several reasons and hold that the affirmative answers to Special Interrogatory No. 26 were but a threshold to further consideration of exemplary damages by the jury. First, there is the language of the statute itself. Article 4004 expressly requires joint and several liability for actual damages but has no such express requirement for exemplary damages:

> All persons making the false representations or promises and all persons deriving the benefit of said fraud, *shall be jointly and severally liable in actual damages*, and in addition thereto, all persons *wilfully making* such false representations or promises or *knowingly taking the advantage* of said fraud *shall be liable in exemplary damages* to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered.

(emphasis added).[71] The parallel language of the actual and exemplary damage provisions is striking and renders the differences significant, particularly since the statute is penal in nature and must be strictly construed, *Westcliff Co. v. Wall*, 153 Tex. 271, 267 S.W.2d 544, 546 (1954). The elements of willfulness and knowledge were expressly added to the exemplary damage provision, while the joint and several liability requirement is conspicuously absent. Examination of art. 4004 leads us to conclude that the Texas Legislature chose not to impose joint and several liability for exemplary damages.[72]

There is ample support in the case law for this interpretation of the statute. Texas courts have long followed several criteria for the evaluation of exemplary damage awards made by a jury in its discretion. The first, that exemplary damages be reasonably proportional to actual damages, *see Southwestern Investment Co. v. Neeley*, 452 S.W.2d 705, 707 (Tex.1970), is governed primarily by statute in cases of fraud—art. 4004 permits exemplary damages to be no more than double the actual damages suffered. The remaining criteria are:

> the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety.

*Schutz v. Morris*, 201 S.W.2d 144, 147 (Tex. Civ.App.—Austin 1947, no writ). Texas law imposes additional criteria for evaluating corporate liability for exemplary damages. *See Ledisco Financial Services, Inc. v. Viracola*, 533 S.W.2d 951, 957 (Tex.Civ. App.—Texarkana 1976, no writ); *accord, Wooley v. Southwestern Portland Cement Co.*, 272 F.2d 906, 907 (5th Cir. 1959). These criteria demand *individual* consideration of each defendant's conduct, situation, sensibilities, and culpability by the jury, consideration that is denied by failing to apportion exemplary damages.

In a case like this with several conspirators (and many other conspirators not before the court) who may have had varying degrees of intent or knowledge, who participated in the scheme in different ways over a long period of time, and who performed in

---

**71.** Tex.Bus. & Comm.Code § 27.01 retains the difference:

> (b) A person who makes a false representation or false promise, and a person who benefits from that false representation or false promise, commit the fraud described in Subsection (a) of this section and are *jointly and severally liable to the person defrauded for actual damages....*
>
> (c) A person who *willfully makes* a false representation or false promise, and a person who *knowingly benefits* from a false representation or false promise, commit the fraud described in Subsection (a) of this section and are *liable to the person defrauded for exemplary damages* not to exceed twice the amount of actual damages.

(emphasis added).

**72.** This conclusion is reinforced by the Legislature's reenactment of art. 4004 in § 27.01 where the same parallel structure was retained. *See supra* nn. 70, 71.

a variety of capacities (an investor, a corporation, and its chairman), the purposes of exemplary damages are ill served by rendering all defendants jointly and severally liable. Joint and several liability for exemplary damages in these circumstances enables coconspirators to shift the burden of those damages onto their less culpable confederates. This undermines their deterrent and punitive purposes. *Cf. Northwestern National Casualty Co. v. McNulty*, 307 F.2d 432, 440 (5th Cir. 1962) (insurance for punitive damages blunts punishment and deterrent purposes by shifting burden from wrongdoer to insurance company). Each defendant vigorously contested his own liability at trial and on appeal, and the evidence as to the liability of each varies considerably. The jury should have been permitted to assess exemplary damages against each defendant in accordance with its evaluation of that defendant.

Our conclusion is buttressed by the line of Texas cases that have either upheld separate consideration of exemplary damages for each defendant in a multi-defendant case or supported the principle of separate consideration. In *Schutz*, the court said:

> Where two or more wrongdoers together take part in the wrong, it is entirely possible that one may be prompted by malice, while the other is not. Or it may be that though both be guilty, the culpability of one is much greater than that of the other, thus warranting a greater penalty.

201 S.W.2d at 147 (citations omitted); *see Norton Refrigerated Express, Inc. v. Ritter Brothers Co.*, 552 S.W.2d 910, 913 (Tex.Civ. App.—Texarkana 1977, writ ref'd n. r. e.); *Walker v. Kellar*, 226 S.W. 796, 798 (Tex. Civ.App.—San Antonio 1920, writ ref'd). *Schutz* sustained separate consideration; *Norton* recognized that it may be necessary in some cases but held it unnecessary under the "unusual" facts of that case; and *Walker* required it for one late-joining conspirator against whom the evidence was weaker.

Chemetron cites *Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex.Civ.App.—Amarillo 1979, writ ref'd n. r. e.), for the proposition that "[e]ach party to a fraudulent transaction is responsible for the acts of others done in furtherance of the scheme." However, *Crisp* is inapposite. It involved only joint and several liability for actual damages, since exemplary damages apparently were not awarded at trial. *See id.* at 612–13. *Crisp* does not create joint and several liability for punitive damages.

Statutory interpretation, Texas case law, and our evaluation of the facts in this case indicate that separate consideration of the amount of exemplary damages for each defendant is required.[73]

### b. *Jury Instructions.*

The defendants claim that they were prejudiced because the jury was not correctly instructed, in Jury Instruction No. 32,[74] on the purposes of exemplary damages

---

**73.** In a recent civil conspiracy case by a parent seeking damages for emotional distress due to the abduction of a child, a federal district court applying Texas law apportioned exemplary damages among the conspirators. Although apportionment was not challenged on appeal, this disposition is in accord with our interpretation of Texas law. *See Fenslage v. Dawkins*, 629 F.2d 1107, 1109, 1111 (5th Cir. 1980).

**74.** Jury Instruction No. 32 said in full:
*Exemplary Damages Under Texas Law*
 If you find that the plaintiff is entitled to actual damages as a result of having proved against any defendant or defendants all of the required elements of the Texas actionable fraud statute, Texas law permits the jury to award the plaintiff exemplary damages in addition to actual damages under certain cir-

cumstances. To be entitled to exemplary damages, the plaintiff must prove that such defendant or defendants willfully failed to disclose a material fact or that such defendant or defendants knowingly took advantage of the failure to disclose a material fact. In such instances a jury is permitted to award exemplary damages not to exceed twice the amount of actual damages.
 If you, the jury, should find from a preponderance of the evidence in this case that the plaintiff is entitled to a verdict for actual or compensatory damages, and should you further find that the act or omission of the defendants or defendant which caused the actual injury or damage to the plaintiff was willfully done or with an intention to knowingly benefit from such, you, the jury, may in the exercise of your discretion, add to the

or how they differ from compensatory damages. The standard of review on this issue was recently summarized:

> "[T]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." Our jurisprudence mandates that we consider the charge as a whole, viewing it in the light of the allegations of the complaint, the evidence, and the arguments of counsel.

*Smith v. Borg-Warner Corp.*, 626 F.2d 384, 386 (5th Cir. 1980) (citations omitted), *quoting Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1100 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). While the standards for evaluating jury instructions in a diversity case are federal, the substance of those instructions must adhere to state law. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1289 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

Looking at the contested instruction, we see the following: (1) the jury was never informed of the purposes of exemplary damages (deterrence and punishment of extraordinary misconduct); (2) the jury was correctly cautioned several times that an award was discretionary; and (3) it was properly told what criteria article 4004 required (intent or knowledge) for exemplary damages. In the arguments of Chemetron's counsel we find instances where counsel informed the jury of the nature of punitive damages. Next, we have the "entitled to" language of Special Interrogatory No. 31, which may be misleading on the

purposes of exemplary damages but is not reversible error in and of itself. *See supra* note 69. Finally, Chemetron sought punitive damages in its complaint and, we note without intimating any view on the sufficiency of this evidence, did present evidence in support of its claim.

Against this backdrop, the defendants point to Texas and federal standard jury instructions on exemplary damages as proof of the trial court's error.[75] However, it is scarcely error *per se* to decline to follow pattern or form book instructions. Nor does *Erie* compel the use of pattern state instructions, since the manner of giving jury instructions is controlled by federal law, *Foster v. Ford Motor Co.*, 621 F.2d 715, 717 (5th Cir. 1980), and a pattern charge is but one procedure for instructing the jury—other procedures may be used so long as they correctly describe the applicable state law. *See Platis v. Stockwell*, 630 F.2d 1202, 1207 (7th Cir. 1980); *Wright v. Albuquerque Auto-Truck Stop Plaza*, 591 F.2d 585, 587 (10th Cir. 1979); *Stafford v. Southern Farm Bureau Casualty Insurance Co.*, 457 F.2d 366, 367 (8th Cir. 1972) (per curiam). Pattern instructions are merely some evidence that an instruction is advisable.

Although it is a close question, we hold that these instructions and the language of Special Interrogatory No. 31 are not erroneous under *Smith*—they did not mislead the jury or create misunderstanding of the issues. The special interrogatory and the instructions made clear to the jury that an award of exemplary damages was discretionary. The special interrogatory and instructions did not erroneously tell the jury

---

award of actual damages such amount as you shall agree to be proper as exemplary. In any event, that amount may not exceed twice the amount of actual damages.

 Whether to make any award of exemplary damages in addition to the actual damages is a matter exclusively within the province of the jury.

**75.** The Texas pattern instructions suggest the following instruction on exemplary damages: " 'Exemplary damages' means an amount which you may in your discretion award as an example to others and as a penalty or by way

of punishment." 1 State Bar of Texas, *Texas Pattern Jury Charges* § 11.10 (1969).

 Federal judges are advised to tell the jury: [T]he law permits the jury, under certain circumstances, ... to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct.

3 Devitt & Blackmar, *Federal Jury Practice & Instructions* § 85.11 (3d ed. 1977).

or even imply that exemplary damages were mandatory. *Compare* nn. 69, 74 *with Crowell-Collier Publishing Co. v. Caldwell,* 170 F.2d 941, 944–45 & n.9 (5th Cir. 1948). While the preferable course would be for the trial judge to instruct on the purposes of exemplary damages, in this case Chemetron consistently sought exemplary damages and presented its case through evidence and argument in a way that made the purposes of exemplary damages clear to the jury. Given the presentation of Chemetron's case, we hold that the jury was not misled or confused by the "entitled to" language of Special Interrogatory No. 31 or by the jury instructions.

While so holding, we reiterate that the issue is close and that a trial judge must be extremely careful to keep exemplary damages within their proper sphere to prevent a jury from assessing them for invalid or speculative reasons. *See Lee v. Southern Home Sites Corp.,* 429 F.2d 290, 294 (5th Cir. 1970). In future trials and particularly if this cause is retried, the "entitled to" phrase should not be used. In addition, we suggest that an instruction on the purposes of exemplary damages will often be found helpful to the jury, enabling it better to distinguish their proper function from that of compensatory awards.

2. Article 4004 and Texas Common Law of Civil Conspiracy.

The defendants challenge their liability as conspirators for violating article 4004. Since we have already found reversible error in the Texas judgment, it is necessary to discuss only one of these challenges, that of Bintliff. Bintliff claims that even if he joined the alleged conspiracy, he joined it well after Chemetron's purchase of Westec stock, and therefore he cannot as a matter of law be held liable for any fraud in connection with that purchase under article 4004. We address this claim to resolve it and to clarify Texas law should this case be retried on the remand that we order.

The elements necessary for liability under article 4004 have already been outlined. *See supra* p. 1171. Bintliff correctly asserts that since he was not involved in the Chemetron transaction, his conduct does not fulfill those elements, particularly the requirement of having fraudulently induced Chemetron, not the public at large, to purchase Westec shares. *See supra* p. 1173; *Oilwell Division, United States Steel,* 493 S.W.2d at 491. However, the Texas common law of civil conspiracy does provide a legal mechanism that could render Bintliff liable to Chemetron for its purchase of Westec shares. We describe this mechanism but express no opinion on whether the evidence in this case renders Bintliff liable, leaving that to the finder of fact if there is a new trial.

Texas recognizes the ancient common-law doctrine that civil conspiracy consists of " 'a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.' " *Fenslage v. Dawkins,* 629 F.2d 1107, 1110 (5th Cir. 1980), *quoting Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 856 (Tex.1968). Unlike criminal conspiracy, civil conspiracy itself does not create liability—the conspirators must pursue an independently unlawful purpose or use an independently unlawful means before they can be held liable. *See, e.g., Markman v. Lachman,* 602 S.W.2d 350, 352 (Tex.Civ.App.—Texarkana 1980, no writ).

In this case, Chemetron alleged and offered proof that the continuing conspiracy Bintliff joined had both an unlawful purpose—market manipulation—and was pursued via unlawful means, including inducing the public to buy or sell Westec stock in violation of article 4004. None of the conspirators had specific sellers or buyers in mind when the conspiracy began or as it progressed. As each transaction occurred, however, the conspirators could meet the criteria for violating article 4004 by defrauding that particular buyer or seller. This case deals with only one fraudulent act in this broad conspiracy and with only one member of the public defrauded, Chemetron.

**1180**

This is where Bintliff misunderstands the interaction of article 4004 and Texas civil conspiracy law. He claims that he cannot be liable to Chemetron unless he *personally* fulfills all of article 4004's criteria. That is true in a nonconspiracy case. But if this court were to accept his argument in this conspiracy case, we would completely abolish civil conspiracy law in Texas. The purpose of civil conspiracy law is to hold conspirators who knowingly and jointly pursue an illegal purpose or use illegal means liable even though all the conspirators do not perform or even know of all the acts done in furtherance of the conspiracy. *See, e.g., Bourland v. State*, 528 S.W.2d 350, 354 (Tex.Civ.App.—Austin 1975, writ ref'd n. r. e.); *Glenn H. McCarthy, Inc. v. Knox*, 186 S.W.2d 832, 838 (Tex.Civ.App.—Galveston 1945, writ ref'd w. o. m.).

This principle also covers late-joining conspirators such as Bintliff. *See, e.g., State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 560 (1937). *Standard Oil* cited *Corpus Juris* as authority for this proposition. Turning to *Corpus Juris Secundum*, we find this rule of law: "Persons having knowledge of a conspiracy who enter into it after its inception and before its consummation are liable for all acts previously or subsequently done in pursuance thereof." 15A C.J.S. *Conspiracy* § 19, at 659 (1967), *citing, e.g., Standard Oil. Accord*, 12 Tex. Jur.3d *Civil Conspiracy* § 4 (1981); 16 Am. Jur.2d, *Conspiracy* § 56 (1979); 1 *Eddy on Combinations* § 376 (1901). This immemorial common-law principle has been widely accepted, *see, e.g., Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970); *Ratner v. Scientific Resources Corp.*, 53 F.R.D. 325, 329 (S.D.Fla.1971), *appeal dism'd for want of juris.*, 462 F.2d 616 (5th Cir. 1972) (per curiam); *Blackstone Industries, Inc. v. Andre*, 232 Ga. 715, 208 S.E.2d 815, 816 (1974), and is simply a restatement of another well-settled principle of conspiracy law "that one who knowingly joins a conspiracy even at a later date takes the conspiracy as he finds it," *Myzel v. Fields*, 386 F.2d 718, 738 n.12 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

Bintliff satisfies the conditions imposed by section 19. He joined the conspiracy after its inception but before its consummation. "A conspiracy, especially one which contemplates a continuity of purpose and a continued performance of acts, is presumed to continue until there has been an affirmative showing that it has terminated . . . ." *United States v. Etheridge*, 424 F.2d 951, 964 (6th Cir. 1970). Consummation of the market manipulation scheme had not occurred before Bintliff's membership in the conspiracy because ample record evidence demonstrates that the purpose of the conspiracy, market manipulation, was still pursued by the conspirators well after his entrance. This continuing conspiracy involved many illegal acts, some occurring before and some after Bintliff's entrance. The defrauding of Chemetron was but one illegal act done in furtherance of the conspiracy, not its consummation.

Civil conspiracy principles do not require that Bintliff have intended to defraud a specific party, only that he knowingly have joined the conspiracy intending to defraud its general targets. *See, e.g., Schlumberger*, 435 S.W.2d at 855–57; *Switzer v. Joseph*, 442 S.W.2d 845, 849 (Tex.Civ.App.—Austin 1969, no writ). These principles do not render Bintliff liable without regard to his intent—Texas conspiracy law in fact substitutes *two* intent requirements for the article 4004 intent requirement. Chemetron must prove that (1) one of his coconspirators violated article 4004 and that (2) Bintliff knowingly joined the conspiracy intending to defraud the investing public. We need not repeat the elements of the former requirement, and the Texas Supreme Court has laid out the criteria for the latter:

"A 'conspiracy to defraud' on the part of two or more persons means a *common purpose*, supported by a concerted action to defraud, *that each has the intent to do it*, and that it is common to each of them, and that each has the understanding that the other has that purpose."

*Schlumberger,* 435 S.W.2d at 857, *quoting Brumley v. Chattanooga Speedway & Motordrome Co.,* 138 Tenn. 534, 198 S.W. 775, 776 (1917) (emphasis in Texas opinion).

If a jury accepts Chemetron's proof that Bintliff knowingly agreed to participate in the alleged conspiracy to defraud the public and the jury also finds that one of his coconspirators violated article 4004 by defrauding Chemetron, Bintliff must be held liable to Chemetron under a long-established rule in Texas: "[A person] having once entered the conspiracy, however late, becomes in law a party to every act previous or subsequently done by any of the others in pursuance of it." *Standard Oil Co.,* 107 S.W.2d at 560 (cited in, *e.g., Logan v. Barge,* 568 S.W.2d 863, 868 (Tex.Civ.App. —Beaumont 1978, writ ref'd n. r. e.); *Mims v. Bohn,* 536 S.W.2d 568, 570 (Tex.Civ.App. —Dallas 1976, no writ)). Thus, Bintliff can

be held jointly and severally liable for the actual damages resulting from the previous act of his fellow conspirators, the defrauding of Chemetron.[76]

Bintliff raises a final argument on this issue that we must address. He claims that while he may be liable for actual damages under article 4004 and Texas conspiracy law based on the acts of his coconspirators, he cannot be held liable for exemplary damages based on their acts.

Earlier in this opinion, we held that the wording of article 4004 and Texas case law require individual assessment of exemplary damages under article 4004. *See supra* at p. 1177. While civil conspiracy law can be used to render Bintliff liable for actual damages under article 4004, we agree with him that punitive damages can only be assessed against him based on *his* conduct. The purpose of punishment and

---

**76.** We note that the interaction of art. 4004 and Texas civil conspiracy law to render Bintliff liable here arguably may raise due process problems. We think not.

Although art. 4004 and the conspiracy law applied here are civil, not criminal, in nature, they can be labelled penal or quasi-criminal because they address fraud and permit punitive damages for violation. In order to err on the side of caution, we will apply criminal law standards in our due process analysis.

The possible due process problem is one of vagueness. Under a criminal statute, a person cannot be held "criminally responsible for conduct which he could not reasonably understand to be proscribed." *Rose v. Locke,* 423 U.S. 48, 49, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975) (per curiam). The due process clause requires that the law give sufficient warning of forbidden conduct. *Id.* at 50, 96 S.Ct. at 244. This right to fair warning can be violated in two ways: (1) vague statutory language or (2) unforeseeable and retroactive judicial expansion of narrow and precise statutory language. *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964). Since art. 4004 is an old statute based on the common law quite precise in its terms and the doctrine of civil conspiracy is well-defined in the common law of Texas, the former possibility is not presented here. It is the latter possibility that is brought about by our meshing of art. 4004 and civil conspiracy law. However, we perceive no due process problems, because our holding today is certainly a foreseeable result.

In Texas, even before the enactment of art. 4004, the common law provided a remedy for actual damages for stock fraud, *see* Bordwine, *Civil Remedies Under the Texas Securities*

*Laws,* 8 Houston L.Rev. 657, 658 & n.6 (1971); exemplary damages were also available in Texas at common law without statutory authorization, *Briggs v. Rodriguez,* 236 S.W.2d 510, 515 (Tex.Civ.App.—San Antonio 1951, writ ref'd n.r.e.); civil conspirators have been jointly and severally liable for actual damages since the 19th century, *see State v. Racine Sattley Co.,* 63 Tex.Civ.App. 663, 134 S.W. 400, 404 (1911, no writ); and exemplary damages have been available for civil conspiracy in Texas since at least 1908, *see St. Louis & Southwestern Ry. Co. v. Thompson,* 102 Tex. 89, 113 S.W. 144, 147 (1908).

Art. 4004 codified the common law of fraud and concomitant exemplary damages, *see Bordwine, supra,* at 658 & n.7, changing (enlarging) only the measure of actual damages, *see El Paso Development Co. v. Ravel,* 339 S.W.2d 360, 363–64 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.), *cited with approval in Stanfield v. O'Boyle,* 462 S.W.2d 270, 272 (Tex. 1971), but the common law of civil conspiracy in Texas has never been displaced by statute or altered by a Texas court. Given this precedent, our decision today is not an unforeseeable judicial expansion of a narrow statute; it is merely the application of time-honored principles of Texas law that Texas courts have used to the present day. *See, e.g., Fenslage,* 629 F.2d at 1110 (1980 diversity case applying Texas law); *Bourland,* 528 S.W.2d at 354 (1975 case holding that civil conspirators are liable despite failure to perform or know of all acts done in furtherance of conspiracy); *Glenn H. McCarthy, Inc.,* 186 S.W.2d at 838 (1945 case with holding identical to *Bourland*).

deterrence would not be served by imposing exemplary damages without regard to Bintliff's individual conduct.[77] No Texas case of which we are aware has ever ignored individual culpability and awarded exemplary damages against civil conspirators on a joint and several basis. *See, e.g., Fenslage*, 629 F.2d at 1109, 1111 (Texas diversity case apportioning exemplary damages among civil conspirators).

This is not to say that, as a matter of law, Bintliff cannot be liable for punitive damages here since he joined the conspiracy late. Article 4004 permits exemplary damages against persons who "knowingly tak[e] ... advantage" of fraud. Thus, if Chemetron can prove that Bintliff knowingly took advantage of the defrauding of Chemetron, he can be held liable for exemplary damages.

### C. Other Issues on Appeal.

We address three other allegations in order to guide the trial court if there is a new trial on remand.

#### 1. *The* In Pari Delicto *Instruction.*

█ Appellants claim that it was error to deny them an *in pari delicto* instruction as to Chemetron. The grant of this defense is within the discretion of the district court, *Wolfson v. Baker*, 623 F.2d 1074, 1082–83 (5th Cir. 1980), *cert. denied*, 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981), and review of this discretion is limited to its abuse. Prior cases limit this discretion and hold that this defense is only available to defendants under the circumstances outlined in *Woolf v. S. D. Cohn & Co.*, 515 F.2d 591, 601–05 (5th Cir.), *on petition for rehearing*, 521 F.2d 225, 226–28 (1975) (per curiam), *vacated and remanded on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

█ One important circumstance is the effect of the dispute on the investing public. If the fraud is worked only between the parties to the lawsuit, the public is not affected. If, however, as here, the fraud affected the public, use of *in pari delicto* is disfavored because it will hinder bringing of securities fraud cases. *See id.* at 602–03; 521 F.2d at 227–28. This circumstance must be given "substantial weight" in determining whether to permit this defense. 515 F.2d at 604.

> [E]ven in a case where the fault of plaintiff and defendant were relatively equal, simultaneous and mutual, the court might still reject the defense if it appeared that the defendant's unlawful activities were of a sort likely to have a substantial impact on the investing public, and the primary legal responsibility for and ability to control that impact is with defendant.

*Id.* In the *Woolf* opinion on petition for rehearing, the court likened this equal-simultaneous criterion to the "vital" cooperation of coconspirators required to accomplish the conspiratorial scheme. 521 F.2d at 228.

█ Given these standards, the evidence does not persuade us that, even if Chemetron was a party to the conspiracy, it was a "vital" party. The trial court could well have concluded that the "primary legal responsibility" for the conspiracy lay with the defendants. Therefore, he did not abuse his discretion in denying this defense.

#### 2. Use of the Zero-Value Theory in Measuring Damages.

In Special Interrogatory Nos. 27 and 30, addressing federal and Texas law, respectively, the jury found that had there been disclosure of the manipulative scheme prior to Chemetron's receipt of Westec stock on January 14, 1966, "the real and actual value" of that stock would have been zero. Defendants appeal the use of the zero-value theory in Chemetron's presentation of its

---

77. This result also avoids the possible due process problems of imposing exemplary damages, which are punitive in nature, on Bintliff without regard to his intent to commit the act for which he is punished. *See Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131, 135 (5th Cir. 1964) (criminal penalties require intentional conduct); Prosser, *Torts* § 2 at 9–10 (4th ed. 1971) (punitive damages a criminal law concept).

case, the theory upon which the answers to Special Interrogatory Nos. 27 and 30 are based. They also appeal other points on the measure of damages.

The briefs are directed almost exclusively to the validity of the zero-value theory and related points under federal law. We need not decide any federal law questions since we have held that Chemetron has no federal cause of action for this fraud. Therefore our analysis of this theory and the other points on appeal is performed according to Texas law to guide a trial on remand.

We first consider an issue other than the theory itself. Defendants allege that Chemetron's expert who advanced the zero-value theory improperly incorporated post-purchase events in his damage assessment. The text of article 4004 expressly describes what evidence is relevant to a damage calculation:

All persons guilty of such fraud shall be liable to the person defrauded for all actual damages suffered, the rule of damages being the difference between the value of the property as represented or as it would have been worth had the promise been fulfilled, and *the actual value of the property in the condition it is delivered at the time of the contract.*

(emphasis added).

It is clear from article 4004 that any events occurring after January 14, 1966, may not be considered in assessing actual damages. Thus, the experts on damages and the jury may not consider, for instance, manipulative transactions after that date, the revelation of the scheme to the SEC, the cessation of trading in Westec stock, or the bankruptcy of Westec. Other considerations, such as an assumption that prepurchase transactions were illegal, may be used if they meet the standard tests for the admission of evidence, adequate foundation and the like. We leave these issues to the discretion of the trial judge on remand.

As to the zero-value theory, Chemetron contends that "actual value" in article 4004 refers only to the market value of the Westec stock, and the market value of Westec stock would have been zero had the

scheme been disclosed. Appellants argue that even if the Westec stock had no market value, it had an intrinsic value representing the assets, tangible and intangible, of Westec, and that article 4004 includes this intrinsic value in the term "actual value."

The resolution of this debate requires an initial inquiry into the nature of damages under article 4004. The seminal case on common law damages for fraud in Texas, *George v. Hesse*, 100 Tex. 44, 93 S.W. 107 (1906), clearly distinguished between the two remedies available to defrauded purchasers. The first is an action for cancellation and rescission of the contract induced by the fraud, one which restores both parties to the status quo. The second, a tort action for deceit, compensates the defrauded purchaser for the difference between the actual value of the property received and the amount paid for that property. This second cause of action, sounding in tort and using an out-of-pocket measure of damages, was expanded by article 4004 into a benefit-of-the-bargain measure of damages in stock and real estate fraud cases. *See El Paso Development Co. v. Ravel*, 339 S.W.2d 360, 363 (Tex.Civ.App.—El Paso 1960, writ ref'd n. r. e.), *cited with approval in Stanfield v. O'Boyle*, 462 S.W.2d at 272 (Tex.1971).

In assessing damages in stock fraud cases under either article 4004 or the common law, Texas courts have employed the standard of value used by the damaged party. Thus, if a damaged party used the market value in striking its bargain, that became the standard. *See, e.g., Chandler v. Butler*, 284 S.W.2d 388 (Tex.Civ.App.—Texarkana 1955, no writ); *cf. Patterson v. Wizowaty*, 505 S.W.2d 425 (Tex.Civ.App.—Houston 1974, no writ) (measure of damages in stock conversion suit based on market value of stock at time of conversion). However, where there is no market for the stock or where it is allegedly worthless, the intrinsic value of the assets, tangible and intangible, represented by the stock is used. *See, e.g., K. W. S. Manufacturing Co. v. McMahon*, 565 S.W.2d 368 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.); *Beckwith v. Powers*, 157

S.W. 177, 180 (Tex.Civ.App.—El Paso 1913, no writ). And in those cases where a damaged party valued stock by reference to the value of underlying assets, damages are calculated by reference to the value of those assets. *See, e.g., Reed v. Holloway,* 127 S.W. 1189 (Tex.Civ.App.1910, no writ). Using the damaged party's standard of value is eminently sensible, since it awards that party its anticipated benefit of the bargain while avoiding speculative and conjectural damages based on unanticipated benefits of the bargain. Such speculative and conjectural damages are forbidden under both article 4004 and the Texas common law of fraud. *George,* 93 S.W. at 108; *El Paso,* 339 S.W.2d at 363–64.

Based on these principles of Texas law, the use of the zero-value theory here was erroneous. The parties established a trading value different from and below the market value of Westec stock on the date of the transaction. There is no evidence that Chemetron contemplated the higher market price as a benefit of its bargain. Chemetron was making an investment in Westec, which is why it used the company's assets in establishing a price for the transaction. Unless Chemetron expected to benefit from the market price, it is speculative and conjectural to award damages based on it.

Even if Chemetron did anticipate the market price as a benefit of the bargain, the damages here would still be speculative or conjectural. The zero-value theory posits that during the panic after the disclosure of a scheme the stock will have no value. Such a panic period is an unpredictable phenomenon—its duration, effect on stock prices, and so forth are highly speculative and conjectural. *See Beecher v. Able,* 435 F.Supp. 397, 402–06 (S.D.N.Y.1977). Aggravating these characteristics is the fact that Chemetron would be selling an unusually large amount of stock—ten percent of all Westec stock. Selecting a measure of damages based on such an unreliable and volatile market risks awarding the plaintiff

a windfall rather than damages. We find that Texas law cannot countenance a zero-value theory of damages.

Therefore, on remand, the zero-value market theory may not be used. Indeed, no theory that uses market value to set damages can be used, since market value played no role in the striking of the bargain. Chemetron must prove that the value it placed on the Westec stock (which ignored market value) was reduced by the fraud. The difference between the amount Chemetron paid (representing the value it placed on the Westec stock) and this reduced value, if any, represents the damages "actually suffered" and recoverable by Chemetron.

3. The Admission of Williams' Securities Fraud Conviction.

■ Defendants argue that the probative value of admitting Williams' securities fraud conviction into evidence was outweighed by its prejudicial effect. The conviction came into evidence in a short, two-question colloquy at the conclusion of Williams' lengthy, complicated testimony on the scheme and was also mentioned in closing argument.

In assessing the relevance and prejudice of this evidence in a civil case under Fed.R. Evid. 403,[78] the trial judge has broad discretion, reviewable only for abuse. *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1347 (5th Cir. 1978). The threshold issue here is the relevance of the conviction. If it is irrelevant, we need not reach the question of whether its probative value is substantially outweighed by its prejudicial effect. We believe that the conviction is certainly relevant. Two crucial elements of Chemetron's case were (1) that the plan to manipulate the market was illegal and (2) that Williams' conduct was illegal. Williams' conviction is relevant to both elements. While Chemetron did explore at length with the jury the scope of the manipulation, its pur-

---

**78.** "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

poses, and its ultimate results, the defendants hotly contested the existence and the illegality of the scheme and the illegality of Williams' conduct. The probative value of his conviction rose when these issues were vigorously contested. *See United States v. Beechum*, 582 F.2d 898, 914–15 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

Having passed the relevancy threshold, we must now consider whether the trial judge abused his discretion when he decided that the "danger of unfair prejudice" posed by the conviction did not "substantially outweigh" its probative value. "The task for the court in its ascertainment of probative value and unfair prejudice under rule 403 calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense." *Id.* at 914. We find this advice on the meaning of "unfair prejudice" in the Notes of the Advisory Committee on the federal evidence rules:

> "Unfair prejudice" within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.... In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction. See Rule 106 [now 105] and Advisory Committee's Note thereunder. The availability of other means of proof may also be an appropriate factor.

28 U.S.C.A. Fed. Rule of Evidence 403 at 102–03 (1975).

█ The defendants could have requested, but apparently did not, a limiting instruction that is their right under Rule 105.[79] Once evidence admissible for one purpose but inadmissible for another is admitted, the trial court cannot refuse a requested limiting instruction. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 266 (5th Cir. 1980). In all likelihood, a limiting instruction would have effectively alleviated the appellants' concerns in this case. We also note that defendants began, but abandoned, cross-examination of Williams on the issue of his conviction, another method they could have used to minimize any prejudicial effect.

The Notes also mention consideration of other means of proof. One aspect of such consideration must be whether Williams' conviction is redundant of other less prejudicial evidence. *Rozier* is instructive on this issue. In *Rozier* the issue was defendants' negligence in manufacturing the car in which plaintiff's decedent was killed when it ignited after being hit from behind by another car. The trial court admitted into evidence the guilty plea on charges of manslaughter of the driver of the other car. On appeal, this court held this to be an abuse of discretion. The court noted that the criminal conviction had limited probative value since it duplicated already ample evidence of the obvious cause of the auto accident in that case. *See* 573 F.2d at 1348. The court also held its relevance as evidence of legal cause "attenuated at best," since it had nothing to do with the issue in the case: the legal liability of the allegedly negligent defendant auto manufacturer for injuries in a car accident. *Id.* This limited relevance was held to outweigh the confusion it could cause the jury as it assessed the legal causes of the tort. *Id.* Therefore, the auto company's introduction of the conviction was barred.

This case is quite different from *Rozier*. While the cause of the accident was obvious in *Rozier*, here the legality of the alleged scheme was strongly disputed between the parties. The relevance of this conviction is not at all attenuated. In *Rozier* there was a danger that the two forms of causation, the obvious cause of the accident and the disputed proximate (legal) cause of the death, would be confused. The conviction was not at all relevant to the dispute over proximate cause. Here, however, Williams'

---

**79.** Limited Admissibility

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, *upon request, shall restrict* the evidence to its proper scope and instruct the jury accordingly. (emphasis added).

activities were pivotal in proving the crucial issue in this case: proximate cause and legal liability. Unless he had done something illegal, his alleged superiors and co-conspirators could not be held liable. Finally, there was little chance of jury confusion sufficient to outweigh the evidence's relevance. The jury was clearly and repeatedly told that defendants' liability was a separate issue from Williams' liability.

Undue prejudice could also have resulted had the conviction been repeatedly emphasized to the jury or had Chemetron introduced the conviction of other conspirators. *See United States v. Fleetwood*, 528 F.2d 528, 535 (5th Cir. 1976). However, neither of these events occurred. We therefore hold that the trial judge did not abuse his discretion in admitting evidence of Williams' securities fraud conviction.

## IV. CROSS–APPEAL ISSUES

Chemetron lodges a cautionary cross-appeal on several issues. This appeal is triggered since we have reversed the judgment under section 10(b) and Rule 10b–5.

A. Denial of Directed Verdict and J. N. O. V. on Special Interrogatory No. 6.

In Special Interrogatory No. 6 the jury found that the price paid by Chemetron for its Westec stock was not "affected by" the fraudulent scheme. Therefore, the defendants could not be liable under section 9. *See* § 9(e), 15 U.S.C. § 78i(e). Chemetron appeals the denial of a directed verdict or judgment withstanding the verdict on this issue and advances an interpretation of "affected by" in support.

The gist of Chemetron's interpretation is that *every* price of a stock being manipulated is a false price until the manipulation is revealed and the market reacts. Therefore, *all* transactions, whether on or off the market, during a manipulation and before its relevation are at false prices, and *all* are "affected by" the manipulation as a matter of law. In support of this far-reaching interpretation, Chemetron cites no case law, only general passages from the legislative history of the 1934 Act on the importance of open and honest securities markets.

█ This interpretation of section 9(e) would obviate its causation requirement. Given Congress' numerous careful substantive and procedural restrictions on a section 9(e) private cause of action, we cannot countenance an interpretation of 9(e) that works at cross-purposes to Congress' intent by effectively reading section 9(e)'s causation requirement out of the statute. At a minimum, "affected by" plainly must mean that the manipulated price influenced or was responsible for the purchaser's or seller's price.[80] *See Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 251–53 (2d Cir. 1979) (transaction before manipulation not actionable; transaction after manipulation not actionable absent allegation and proof of effect on sale price); *Rosenberg v. Hano*, 121 F.2d 818, 821 (3d Cir. 1941) (price of stock purchased before alleged manipulation occurred not "affected" under section 9); *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith*, 450 F.Supp. 639, 647 (S.D.N.Y. 1978) (sale at predetermined net book value price cannot be "affected by" alleged manipulation under section 9(e)). The Supreme Court has characterized section 9 as designed to recover an "improper premium exacted for . . . stock." *Piper*, 430 U.S. at 46, 97 S.Ct. at 951.

█ Under this minimum definition, the jury verdict was amply supported by the evidence. W. W. Whitnell, an officer of Chemetron, testified at trial that he was "the person primarily in charge of determining what would be a fair price for the [Westec] stock." He served as the "leading negotiator for Chemetron in connection with the Chemetron/Westec deal." In deposition testimony that he reaffirmed at trial, Whitnell said that the negotiators struck a bargain for the nonmarket transaction in October 1964. This bargain was approved

---

**80.** Since this minimum definition cannot be satisfied in this case, we express no opinions on the degree of responsibility or influence required by § 9(e) or the existence of other restrictions on the § 9(e) causation requirement.

by the parties and led to the January 1966 exchange of stock. For purposes of the bargain, Westec shares were to be valued at $14 per share, a price below its market trading price in both October and January. When asked how the $14 figure was arrived at, he responded: "[W]e felt that $14 was a fair price based on the fundamental value of the company. We were not influenced by the market. I have long ago learned that market prices have nothing to do with fundamental values."

Thus, just as in *Crane, Rosenberg,* and *Kerrigan,* it is clear that the allegedly manipulated market price of the Westec shares in no way influenced or was responsible for the nonmarket price Chemetron paid for its Westec stock. Chemetron did not base its price on the market price or even use it as a factor. Therefore, it paid no "improper premium" for the Westec stock it purchased. While Chemetron was apparently aware of the market price, it was completely ignored or totally discounted in its Westec negotiations. Mere awareness of the allegedly manipulated market price will not suffice under section 9(e).

B. Collateral Estoppel.

Chemetron argued in its proposed pretrial order that Bintliff be collaterally estopped from relitigating certain factual issues adjudicated adversely to him in *Cosmos Bank v. Bintliff,* Civ. Action No. 67-H-590 (S.D. Tex.1975). The trial court denied Chemetron's proposal, and it appeals.

It is necessary to detail the facts at some length in order to analyze this question correctly. *Cosmos Bank* was one of the many cases arising out of the Westec collapse. The instant case, *Cosmos Bank,* and many others were consolidated for the purposes of pretrial proceedings in 1970. *Cosmos Bank* came to trial before Judge Hannay without a jury from December 17, 1974, until February 12, 1975. On May 1, 1975, the trial judge filed and entered a lengthy "Memorandum and Order" detailing his findings of fact and conclusion of law. Based on those findings and conclusion, judgment for over $700,000 in damages and interest was to be awarded to the plaintiff. Plaintiff filed a motion for judgment on May 9, and on May 16 Bintliff filed his motion in opposition to entry of judgment.

On May 29, Bintliff's counsel wrote the United States District Clerk, saying that Bintliff and Cosmos Bank would settle *only if* the trial judge would sign an order preventing use as offensive collateral estoppel of the findings and conclusions.[81] On May 30, Cosmos Bank and Bintliff filed their joint motion and proposed order. However, the trial judge refused to sign the order because it ordered a new trial for which, the trial judge said in a letter to counsel, "[t]here is, in my opinion, no basis." The trial judge proposed a different order and threatened to act on plaintiff's pending motion for judgment unless his proposed order was promptly agreed to.[82] The parties accepted that order, and the judge signed and

---

**81.** This is the text of the letter:
Since I talked to you last, Mr. Bintliff has offered to settle this matter for a sum which Cosmos has agreed to accept. *The settlement is, however, contingent on the Judge's entering a form of order which will protect Mr. Bintliff against the use of the Judge's findings and conclusions in other litigation.* Accordingly, [the attorney for Cosmos] and I will be filing promptly a joint motion for relief designed to meet Mr. Bintliff's problems and I would appreciate it if the Judge would consider our previously filed motion for judgment only in the event that he decides to deny the joint motion which is about to be filed.
(emphasis added).

**82.** The letter to counsel read, in pertinent part:

I have studied your Joint Motion for dismissal of the above matter. While I favor your agreement to settle and am willing to sign an order of dismissal that provides for withdrawal of my previous findings and conclusions, the proposed form of order granting a new trial is unacceptable. *There is, in my opinion, no basis for a new trial.*
I am enclosing an order that is acceptable to me. If you want me to enter this order as a part of your agreed settlement each of you should approve it at the place indicated and return it to [the district clerk] promptly. *Otherwise, I will take up for consideration Plaintiffs' pending motion for judgment on my findings and conclusions.*
(emphasis added).

entered it on June 17, 1975, dismissing the case with prejudice and withdrawing and setting aside the findings of fact and conclusion of law.[83] Chemetron's proposed pretrial order contained 158 findings of fact taken verbatim from the 221 findings of fact made by the court and then set aside in *Cosmos Bank*. However, the trial judge refused to estop Bintliff from relitigating those facts, a refusal Chemetron appeals.

■ As a preliminary issue we must decide which offensive collateral estoppel rules, Texas or federal, to apply. Because this case was brought in federal court based on federal question and pendent jurisdiction and the estoppel claim is based on a prior case in federal court, we will apply federal rules. *See Stovall v. Price Waterhouse Co.*, 652 F.2d 537, 540 (5th Cir. 1981).

■ The Supreme Court's landmark case of *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), established the criteria for the use of offensive collateral estoppel. In *Parklane* the precise question was "whether a party who has had issues of fact adjudicated adversely to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party." 439 U.S. at 324, 99 S.Ct. at 648. The question in this case is nearly identical. The Court initially expressed its approval of the offensive use of the doctrine if it can be

used to prevent relitigation of issues and to promote judicial economy. *See id.* at 326–31, 99 S.Ct. at 649–651. However, in order to avoid problems with the doctrine's use, the Court adopted a general rule to guide the lower courts:

> The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id.* at 331, 99 S.Ct. at 651.

The first step in the application of this rule is to determine whether Chemetron could have joined the *Cosmos Bank* suit. We find that that was not possible. As the Westec cases were filed in Houston or transferred from New York, nearly all of them were placed on Judge Hannay's docket. *See Wyndham Associates v. Bintliff*, 398 F.2d 614, 619–20 (2d Cir.), *cert. denied*, 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968). He entertained motions to consolidate for various purposes. Some cases were consolidated for all purposes, including trial, but Judge Hannay expressly consolidated *Cosmos Bank* and *Chemetron* "for purposes of pretrial proceedings and *none other.*" (emphasis added). This order, supported by the court's thorough familiarity with these cases, *see id.*, demonstrates to us that consolidation was carefully considered and rejected. The reasons for rejection are

---

**83.** The order stated:

The joint Motion of Plaintiff, Cosmos Bank, and Defendant, David C. Bintliff, having been heard by the Court; and it appearing to the Court that Plaintiff, Cosmos Bank and Defendant, David C. Bintliff, have agreed upon a compromise settlement of all claims and causes of action which were, or could have been asserted by and between them in the above-styled cause, and as a part of such compromise settlement agreement, have jointly moved the Court that this Order be entered, and the Court being of the opinion that the compromise settlement agreement which fully disposes of the claims of Plaintiff against all parties, should be approved;

THEREFORE, it appearing to the Court that pursuant to the Compromise Settlement Agreement of Plaintiff, Cosmos Bank, and Defendant, David C. Bintliff, all claims and

causes of action which were, or could have been asserted, by and between them in this cause, have been compromised and settled and the consideration therefore paid in full;

IT IS ORDERED, ADJUDGED AND DECREED that the above styled cause be and it is hereby DISMISSED with prejudice as to Defendants, David C. Bintliff, Lester L. Lilley, Ernest M. Hall, Jr., and James W. Williams, and the Findings of Fact and Conclusion of Law heretofore entered by the Court in this cause be and the same is hereby withdrawn and set aside.

IT IS FURTHER ORDERED that costs of court be and they are hereby taxed against the Defendants, jointly and severally including the sum of $1,500 as a part of the Special Master's Fee who supervised a portion of the consolidated discovery of which this case was a part.

obvious, since *Chemetron* began with far more defendants (57) than *Cosmos Bank* (4), involved far more transactions, and was in general much more complex. Basically, only Bintliff's participation was common to both cases. Thus, deference to the expertise of the trial court and our own analysis of the two cases convinces us that Chemetron could not have joined *Cosmos Bank.*

The second step in our analysis is possible unfairness to defendant Bintliff. The Court in *Parklane* gave several examples of possible unfairness to the defendant that should block the use of offensive collateral estoppel. The first was that if the defendant was sued in the first action "for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable." 439 U.S. at 330, 99 S.Ct. at 651 (citations omitted). That is not true in this case. The damages in *Cosmos Bank* were over $400,-000, plus interest, eventually totalling over $700,000, hardly "small or nominal damages" in absolute terms. In this case on remand, Bintliff does face the possibility of damages greater than those he faced in *Cosmos Bank.*[84] However, he knew other cases such as this one bearing on the same issues and requesting larger damages were pending, as evidenced by the common discovery procedure and his eagerness to settle and avoid offensive collateral estoppel. He had every incentive to defend vigorously in *Cosmos Bank.*

Another unfair situation is where "the judgment relied upon as the basis for estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Id.* (footnote omitted). There is no such inconsistency here because there are no previous judgments.

"Still another situation where it might be unfair to apply offensive collateral estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 630–31 (footnote omitted). The Court suggested that such procedural obstacles could be an inconvenient forum inhibiting full discovery or the availability of witnesses. *Id.* at 631 n.15. There are no such procedural problems here. Indeed, *Cosmos Bank* was originally filed in New York, and Bintliff had it transferred to Houston, where he lives, for convenience. *See Wyndham Associates,* 398 F.2d at 616–17; *In re Westec Corp.,* 307 F.Supp. 559, 563 Sch. B. (J.P.M.D.L.1969) (per curiam). We perceive Bintliff to be at no disadvantage due to the *Cosmos Bank* procedures. If anything, in these cases Chemetron has been inconvenienced by the forum as an out-of-state corporation.

■ The *Parklane* Court did not consider its list of considerations exhaustive. *See* 439 U.S. at 331, 99 S.Ct. at 651. To seek others, we turn to our circuit's precedent. Even before *Parklane,* the circuit "had stressed the importance of fairness in the particular circumstances of a given case when a litigant sought to invoke offensive collateral estoppel." *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1171 (5th Cir. 1981). Canvassing our precedent, we discover these criteria, many repeated in *Parklane* : (1) party against whom estoppel is asserted must have had a "full and fair" opportunity to litigate the issue in the prior case; (2) application of the doctrine must not create "injustice"; (3) application of the doctrine must not contravene any "overriding public policy"; (4) parties who are defendants in both actions must be closely scrutinized to avoid unfairness; (5) the issue to be concluded must be identical to that involved in

---

84. On remand in this case Bintliff faces only state law liability, since this opinion has eliminated any federal liability. He may not even face state liability, since we have held that Chemetron must prove some additional elements of an art. 4004 claim not proven in the original trial. If Bintliff is held liable under art. 4004, his actual damage liability will be joint and several, while any punitive damages will be

individual. Actual damages will probably be reduced on remand, since this court has rejected the zero-value theory. Finally, as a late-joining conspirator, Bintliff's punitive damages could be considerably less than his fellow defendants.

All in all, Bintliff's exposure to higher damages in this case is not severe enough to prevent the use of offensive collateral estoppel.

the prior action; (6) in the prior action the issue must have been "actually litigated"; and (7) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. *See Johnson v. United States*, 576 F.2d 606, 614–15 (5th Cir. 1978).

Criteria 1, 2, 4, and 6 have been covered already. Criterion 3 requires us to consider our view that settlements are "highly favored in the law." *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 176 (5th Cir. 1975), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976). But the *reason* that settlements are favored is that they avoid litigation. *Id.* Here Bintliff settled only to avoid offensive collateral estoppel, not litigation, since the entire trial had run its course, and only the judicial act of signing a final, *known* adverse, judgment was left.[85]

As to criterion 5, there is no question that the factual issues are the same. Criterion 7, because it appears to require a "judgment," leads us to an evaluation of whether we should require the final ministerial act of entering final judgment before giving collateral estoppel effect to the findings of fact of the trial court.[86]

 The general rule in this circuit is that there must be "judicial finality" before collateral estoppel can be invoked. Since judicial finality has been assumed without analysis to require entry of final judgment, a settlement with no final judgment on the merits has been said to bar collateral estoppel. *See, e.g., Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 538 (5th Cir. 1978); *Associates Capital Services Corp. v. Loftin's Transfer & Stor-*

age Co., 554 F.2d 188, 189 (5th Cir. 1977) (summary calendar) (per curiam). However, none of our cases have fully considered the "judicial finality" requirement in an offensive collateral estoppel case such as this one. *Loftin's* summarily denied the defensive use of collateral estoppel on a jurisdictional issue by the defendant in that case. In *Kaspar* the issue was the res judicata or collateral estoppel effect of a prior consent judgment dismissing a suit between the same two parties. Particularly relevant to our case, the court expressly acknowledged that the "final judgment" requirement is relaxed in the case of collateral estoppel. *See* 575 F.2d at 538 n.11. Most important, *Kaspar* and *Loftin's* predated the watershed case on offensive collateral estoppel, *Parklane*, which, as we stated recently, created a "need to redefine the doctrine of collateral estoppel," *Migues v. Fibreboard Corp.*, 662 F.2d 1182, 1187 (5th Cir. 1981). Given *Kaspar*'s reservation of the question of finality in the collateral estoppel context and the guidance of *Parklane*, the definition of "judicial finality" for purposes of offensive collateral estoppel is an open question in this circuit.

As the Second Circuit pointed out in *Kurlan v. C. I. R.*, 343 F.2d 625, 628 n.1 (2d Cir. 1965), "general expressions that only final judgments can ever have collateral estoppel effect are considerably overstated." In *Kurlan* the court upheld giving collateral estoppel effect to the opinion of an appellate court even though the case had been settled on remand. The *Kurlan* court was acting based on sound precedent.

In *Zdanok v. Glidden Co., Durkee Famous Food Division*, 327 F.2d 944, 955 (2d Cir.)

---

**85.** It may have been arguable in the first *Chemetron* trial that the *Cosmos Bank* settlement avoided litigation by avoiding an appeal. There are two problems with this argument. First, the amount of work necessary to pursue an appeal in *Cosmos Bank* seems relatively small compared to the judicial and adversary effort required to undertake years of discovery and several weeks of trial. Therefore, the savings of legal resources by settling after a full trial were nominal. Second, that argument has no force now, since this issue has come before an appellate court.

**86.** The only significant difference between this case and *Parklane* is that in *Parklane* judgment was entered in the underlying case and was affirmed on appeal, *see* 439 U.S. at 325, 99 S.Ct. at 648, thus satisfying even the toughest judicial finality requirement. In this instance, while the case was fully litigated, entering judgment on the findings and conclusion was prevented by a last-minute settlement made with other cases, including this one, and the threat of offensive collateral estoppel looming.

(Friendly, J.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), *cited with approval in Johnson*, 576 F.2d at 614, the court held:

> Dealing with this very question of the kind of finality of judgment necessary to create an estoppel, we pointed out, quite recently, that collateral estoppel does not require a judgment "which ends the litigation ... and leaves nothing for the court to do but execute the judgment," *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631 [633], 89 L.Ed. 911 (1945), but includes many dispositions which, though not final in that sense, have nevertheless been fully litigated. *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961), cert. denied, 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962), and cases cited. As we there said, " 'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.

The Second Circuit has reaffirmed these principles several times. *See, e.g., United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1265 (2d Cir. 1975), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976). Other circuits agree with these principles as well. " 'Finality' in the sense of 28 U.S.C. § 1291 is not required" for collateral estoppel. *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 996 (7th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

Thus, the finality requirement does not necessarily demand the ministerial act of executing a judgment. It does not elevate form over substance in that fashion—the accurate definition of "finality" in the offensive collateral estoppel context is "fully litigated." In this instance, the facts of Bintliff's activities found in *Cosmos Bank* have been found again by the jury in *Chem-*

*etron.* Thus, they have been twice fully litigated. That Judge Hannay felt he had rendered a fully litigated, fair, and correct adjudication on the merits in *Cosmos Bank* is evidenced by his refusal to sign an order granting a new trial because such an order had "no basis" and by his threat to enter judgment.

A recent opinion in the Ninth Circuit reinforces our conclusion here. In *Aetna Casualty & Surety Co. v. Jeppesen & Co.*, 440 F.Supp. 394 (D.Nev.1977) (ruling on motion for summary judgment), 463 F.Supp. 94 (1978) (judgment), *vacated on other grounds and remanded*, 642 F.2d 339 (9th Cir. 1981), the district court confronted an issue very similar to the one we face: can a plaintiff not a party to a prior case invoke offensive collateral estoppel against the defendant when that case had been fully litigated as to liability but settled before trial on the issue of damages and entry of final judgment? In its ruling on the motion for summary judgment, the trial court carefully and thoroughly reviewed the need for "finality," discussing the concepts and cases we have cited, *see* 440 F.Supp. at 401–06, and held that both case law and equity compelled an affirmative answer to the question, *id.* at 405–06.[87]

In conclusion, we have held that "although the decision to apply offensive collateral estoppel rests in the discretion of the trial judge, ... this discretion is not unbounded and must be channeled through the considerations of fairness listed in *Parklane*, along with any other considerations of fairness which the trial judge deems appropriate." *Hicks*, 662 F.2d at 1172–73 (citation and footnote omitted). We have analyzed the *Parklane* considerations and this circuit's considerations, and Bintliff neither points out nor do we see any others that would render the use of offensive collateral estoppel against Bintliff in any way unfair "in the particular circumstances" of this case.[88] Tactically he chose to litigate fully

---

**87.** On appeal, the court did not reach the merits of the ruling on offensive collateral estoppel. Because of this, we cite the district court's opinion in *Aetna* only for the persuasive value of its reasoning.

**88.** One last contention that Bintliff may raise

*Cosmos Bank*, risking an adverse decision. He lost on that risk, and only when he lost did he decide to settle, fearing offensive collateral estoppel. Yet now he seeks to avoid the consequences of that loss by elevating form over substance. He cannot have it both ways. The findings of fact against Bintliff in *Cosmos Bank* are sufficiently final to permit their use in this case. On remand, Bintliff should be collaterally estopped from relitigating those facts.

C. Federal Securities Law Claims Against Bintliff Based on Chemetron's Alleged 1969 "Forced Sale" of its Westec Shares to the Bankruptcy Trustee.

■ Chemetron claims that it should have been permitted to submit to the jury claims against Bintliff under sections 10(b) and 9, and Rule 10b–5, arising out of an alleged "forced sale" of its Westec stock to the Westec bankruptcy trustee in June 1969.

The scope of this issue on appeal can be quickly narrowed. Since we have held that the fraud at issue here gives rise only to a section 9 cause of action, the "forced seller" doctrine of Rule 10b–5 cannot be applied. That leaves the issue of whether the 1969 claim is cognizable under section 9. However, we need not reach the merits of this claim, since it is quite evident from the proceedings below that Chemetron has been less than diligent in pursuing this claim and gave the trial judge ample cause to deny its submission to the jury.

Chemetron's 1967 complaint asserted many causes of action and described the alleged manipulative scheme as well. However, that complaint could allege nothing about a 1969 transaction with the bankruptcy trustee. Its only reference to the bankruptcy was to say that "[Westec] is currently undergoing reorganization in a proceeding under Chapter X of the Bankruptcy Act" caused by the manipulative scheme. This was enough, Chemetron claims, to put

the defendants on notice of a *possible* claim arising out of a *possible* bankruptcy "sale." Chemetron argues that further notice, if necessary, was provided by discovery in August 1974, when defendants were informed of the terms of the "sale."

As a result of the complaint and discovery, Chemetron asserts that there was adequate notice of this claim under Fed.R. Civ.P. 8's liberal pleading doctrine. However, Chemetron neglects the strictures of Fed.R.Civ.P. 9:

(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

While Rules 8 and 9 must be read in conjunction, *see Powell, Inc. v. Abney*, 83 F.R.D. 482, 487 (S.D.Tex.1979), Rule 9(b) still requires that defendants be fairly apprised of the claims against them, including the "consequence[s] of the fraud," *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1088 (S.D.N.Y.1977), *aff'd mem.*, 636 F.2d 1201, 1203, 1206 (2d Cir. 1980), and particularly of "the purchase or sale transactions ... effectuated by reason of the misrepresentations," *Rich v. Touche Ross & Co.*, 68 F.R.D. 243, 247 (S.D.N.Y.1975). Therefore, the 1967 complaint in and of itself did not satisfy Rule 9(b) because it did not even mention the 1969 sale. Rules 8 and 9(b) required that Chemetron amend or supplement its complaint with a short, concise statement stating a claim based on the 1969 transaction.

Nor do we think discovery here afforded adequate notice of this claim to the defendants in the absence of a sufficient complaint. In 1974, the defendants apparently learned of the 1969 transaction through interrogatories. But merely learning of the "sale," without more, did not give them notice of a specific claim arising out of it

---

but has not is the denial of his seventh amendment right to a jury trial on the facts at issue here, since *Cosmos Bank* was a bench trial. However, *Parklane* addressed this seventh

amendment problem and found this use of offensive collateral estoppel constitutional. *See* 439 U.S. at 333–37 & n.24, 99 S.Ct. at 652–655 & n.24.

for at least two reasons. First, the traditional use of evidence of such a transaction would be to prove damages arising out of Chemetron's original purchase of Westec stock, not to create another cause of action. In fact, that is precisely the use to which the trial judge put evidence of the 1969 transaction. In the judgment, he also set off the value Chemetron received in that transaction against the damages awarded, a setoff that Chemetron accepted.

Second, while the federal rules do not require statement of a legal theory in order to obtain relief, see *Hostrop v. Board of Junior College District No. 15*, 523 F.2d 569, 581 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), a section 9 "forced sale" claim is so novel that defendants' counsel would have had to be most prescient to be on notice of it from simply the original complaint and discovery. While the doctrine of "forced sale" appears to be well entrenched under Rule 10b–5, see *Alley v. Miramon*, 614 F.2d 1372 (5th Cir. 1980), its origin was in a Rule 10b–5 case, *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), and Chemetron neither cites nor are we aware of the use of the doctrine outside of Rule 10b–5 cases. Chemetron thus makes the unprecedented argument that there is an analogous doctrine under section 9 and that an exchange of shares in a bankruptcy proceeding is such a "forced sale." Our initial reaction is that the differences between section 9 and Rule 10b–5, particularly Congress' strict limits on section 9, may preclude the development of such a doctrine.[89] We need not decide this question in order to illustrate our point: even after discovery, defendants could not possibly have had any semblance of "fair notice" that Chemetron planned to present such an unusual section 9 theory to the jury.

Overall, then, we hold that defendants never had sufficient notice of this claim until the pretrial conference held shortly before trial in August and September of 1979, more than ten years after the 1969 "sale." When Chemetron submitted its proposed pretrial order containing this claim at the conference, defendants were naturally surprised and objected. In response to a subsequent motion by Chemetron, the trial judge, in October 1979, barred a claim based on the 1969 transaction and limited the use of evidence about the 1969 "sale" to one issue:

> ORDERED that Chemetron Corporation will not be barred from submitting evidence regarding its sale of Westec stock on June 24, 1969, as that sale relates to establishing the measure of damages as an element of its cause of action for violations of § 9(e) asserted against Defendant Bintliff in Plaintiff's Complaint.

Chemetron never objected to this order and never pursued its fall 1979 motion for leave to file supplemental pleadings pursuant to Fed.R.Civ.P. 15(d), specifically alleging and seeking relief based on the 1969 "sale." Only now does Chemetron complain of the trial court's failure to grant the motion to supplement.

Granting such a motion is within the discretion of the trial court. *Aladdin's Castle, Inc. v. City of Mesquite*, 630 F.2d 1029, 1037 (5th Cir. 1980), *rev'd in part and remanded on other grounds*, —— U.S. ——, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). Since

---

**89.** It is far from clear that the Rule 10b–5 forced sale doctrine even covers the 1969 transaction. Our prior cases have held only that "substantial" liquidations of a shareholders' interest qualify under this doctrine. *See Alley*, 614 F.2d at 1384–87, and cases discussed therein. Chemetron's interest in Westec may not have been "substantially liquidated" in the 1969 transaction, since Chemetron exchanged 411,866 shares of "old" common stock and 30,000 shares of "old" preferred stock for 41,-866 shares of reorganized Westec common stock, 100,000 shares of reorganized Westec preferred stock, cash, a note, and cancellation of indebtedness. Thus, even if this was a "liquidation," it does not appear to be "substantial," since Chemetron retained a sizable interest in Westec. Our doubts about this cause of action under § 9 are enhanced by this question of its existence under Rule 10b–5. In view of the remand that we order, we pretermit further discussion of the point and expressly leave it unresolved, so that the trial court may first consider and address it should it arise.

there is virtually no precedent in our circuit on Rule 15(d), we rely on Rule 15(a) cases, since the two are treated alike in evaluating a trial judge's exercise of discretion, 6 C. Wright & A. Miller, § 1504 at 541 (1971). Those cases list several factors that justify denial of leave to amend: (1) undue delay, (2) bad faith or dilatory motive by the movant, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, or (5) futility of amendment. *See Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981); *Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981).

Given these factors, we hold that there were the "substantial reason[s]" required under Rule 15 to deny the motion to supplement. *See Dussouy*, 660 F.2d at 598. In *Dunn v. Koehring Co.*, 546 F.2d 1193, 1198–99, *clarified on reh'g and denial of reh'g en banc*, 551 F.2d 73 (5th Cir. 1977), we upheld the court's discretion to deny an amendment offered on the morning of trial, five years after the filing of the case, and after over four years of "extensive pretrial preparation." Here, on the eve of trial, over twelve years after the complaint was filed, over ten years after the 1969 "sale," and after ten years of very extensive pretrial work, Chemetron moved to supplement. Given this undue delay and lack of diligence in moving to supplement, Chemetron had the burden of showing that the delay was due to oversight, inadvertence, or excusable neglect. *Gregory*, 634 F.2d at 203. It has not advanced, nor do we comprehend, any reasons meeting this burden. We detect undue prejudice as well. That Chemetron would add this claim immediately before trial may suggest a complaint in search of a wrong. *See Rich*, 68 F.R.D. at 247.

Balanced against these "substantial reasons" to deny is the possible prejudice to Chemetron of denial of leave to supplement. That prejudice is preclusion of a section 9 claim based on the 1969 transaction. Given the weakness of that legal theory and the fact that Chemetron's primary cause of action arose out of its original purchase of the Westec securities, this prejudice is slight. Finally, judicial econo-

my gave the trial court further cause to bring this case to trial without additional delay twelve years after its filing. For these reasons, we deny Chemetron's cross-appeal on this issue.

## V. CONCLUSION

To summarize, we hold and order the following: (1) Chemetron has no section 10(b) or Rule 10b–5 action in this case, and the judgment, insofar as it is based on them, is reversed; (2) the judgment for actual and exemplary damages based on Texas law is reversed due to the errors found; on remand the parties may retry the Texas claims in accordance with the rulings on Texas law and other issues found in this opinion; and (3) we find merit in only one of Chemetron's cross-appeal claims; in a new trial on remand, Bintliff may be collaterally estopped from relitigating facts found in *Cosmos Bank.*

REVERSED AND REMANDED.

JERRE S. WILLIAMS, Circuit Judge, concurring in part and dissenting in part.

I concur in all parts of Judge Gee's opinion except Part III, A, the Federal Securities Law claims. I particularly note my concurrence in those portions of the majority opinion to which Judge Reavley directs his dissenting views.

Judge Gee's opinion rules out any liability under federal law for the stock manipulations of James Williams and those who participated in or who are responsible for his activities. The opinion is meticulously reasoned. The difficulty I have with it is that it leads to a result which borders on the absurd. In spite of the reasoning, I cannot conclude that Congress intended any such result.

The defendants before the Court, Business Funds, Inc. (BFI) and David Bintliff are responsible for the manipulations of Williams and John Austin, Chairman of BFI, upon which this lawsuit is based. Williams was found to have engaged in a (1) scheme relating to the purchase or sale of stock, which included (2) misstatements or

omissions (3) of material facts, (4) made with scienter, (5) upon which Chemetron relied, (6) causing Chemetron's injury, and (7) touching upon the loss in value of the stock. We have held that these are the elements required by Section 10(b) of the statute and Rule 10b–5. See, *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir. 1981). But because Williams' activities failed to "affect" the purchase or selling price of the stock, according to the finding of the jury, Williams and those responsible for his actions are found by this Court to have committed no federal securities offense at all.

In evaluating this case it is of significant aid to speculate what the result would have been if Chemetron had brought its suit only under Section 10(b) and not referred to Section 9(a) at all. I should think the result is clear. An offense was committed by the defendants under Section 10(b) and Rule 10b–5. All of the requisites were met. It is only because an additional element of an offense under Section 9(a) was not proven that the defendants are freed of all responsibility for having violated federal securities law. This is an overtly unrealistic view of the law, and I cannot conceive that Congress would contemplate such a result.

If it were true that this was some unusual kind of stock manipulation which could only be cognizable under Section 9(a), then the majority opinion's analysis would be correct. But such is not this case. The defendants through Williams engaged in a number of different kinds of manipulations and deceits designed to enhance the value of the stock. These manipulations and deceits were not unique nor unusual for such offenses. At least some of them were "manipulative or deceptive" devices or contrivances clearly at the core of a Section 10(b) violation as well as a Section 9(a) violation. The Section 9(a) violations charged in this case require a series of transactions. Section 10(b) requires only one. But surely it cannot be argued that someone who commits one violation under Section 10(b) must go free if he commits more than one unless additional and more stringent proofs are met. This would be an open invitation to

commit more than one offense to make responsibility more difficult to prove.

It is quite true, as the opinion for the Court points out, that Section 10(b) was created as a "catch-all." It was intended to cover transgressions other than those covered by the specific requirements of Section 9(a) and a number of other sections of the statute. But I cannot see what is wrong with the use of a catch-all. As the jury found, Williams did not violate Section 9(a). But he was in complete and literal violation of Section 10(b). Hence the application of a "catch-all."

The opinion for the Court concedes that "Rule 10b–5 has been extended well beyond its gap-filling purpose as originally envisioned by Congress in Section 10(b) and proposed by the SEC." The major alteration of the scope of Section 10(b), of course, was the finding of an implied private right of action under Rule 10b–5 in *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D. Pa.1946). The private remedy is now well established, see *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). The earlier pattern of the statute was found in the specific provision in Section 9(e) for a civil remedy for those damaged by stock manipulation schemes under Section 9, but with no comparable civil remedy provision in Section 10(b), thus leaving 10(b) violations to governmental enforcement. But the subsequent creation by judicial interpretation of a civil remedy under Section 10(b) must not be taken as narrowing the scope of Section 10(b). It was a broadening of Section 10(b), not a narrowing.

It is asserted, however, that we are bound by the analysis of this Court in *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981), *modified on denial of rehearing and of rehearing en banc*, 5th Cir., 650 F.2d 815, *cert. granted*, —— U.S. ——, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982). In my view, the Court in the instant case is not bound by the *Huddleston* case for two reasons. In the first place, in that case the Court upheld as proper, private remedies, even

with admitted overlap, under both Section 17(a) and the Section 10(b) "catchall." The substantive provisions of Section 17(a) of the statute were found to be different from the substantive provisions of Section 10(b). The Court found that the Section 10(b) offense charged required different, and in some circumstances stronger, proof than that required by Section 17(a). Therefore, the analysis in *Huddleston* which the majority opinion urges is that if Section 10(b) does not make some additional requirements over offenses charged in the other section it cannot be used. But this analysis was not a part of the holding in that case because the Court upheld the overlapping remedy, nor was it necessary to the holding.

But the second, and more compelling reason, is that the *Huddleston* analysis did not focus at all upon or evaluate in detail a situation where, as in this case, a person engaged in deceitful stock manipulations would clearly be in violation of Section 10(b) while another person who did the same thing but was charged with his actions having a serious and harmful additional impact would go free.

*Huddleston* points out clearly in its footnote 7, 640 F.2d 542, that the authority in existence is overwhelmingly in favor of recognizing that conduct covered by the express liability provisions of the 1933 and 1934 acts may also be covered by Section 10(b). This view is confirmed in footnote 9 of the majority opinion. *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 788 (2d Cir. 1951) established this rule. It was stated as the rule of law in 1 A. Bromberg, Securities Law: Fraud—SEC Rule 10b–5 § 2.4(1), at 27–28 (1967). Particularly noted should be the case of *Schaeffer v. First National Bank of Lincolnwood*, 509 F.2d 1287 (2d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976) holding that a plaintiff can file claims under both Section 9 and Rule 10b–5, the same situation as in the instant case.

But *Huddleston* argued that these cases and these authorities are now somewhat in doubt as a result of recent Supreme Court

decisions "curtailing the broader sweep given the Securities Acts by lower federal courts . . . .," 640 F.2d 534, 541. The majority opinion discusses these cases beginning at MSP 10 and also MSP 29. But these cases are not at all controlling in Chemetron's situation. *Blue Chip Stamps, supra*, held only that a person who was neither a purchaser nor a seller could not claim the benefits of Section 10(b). This had already been the law under the *Birnbaum* rule since 1952. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1386 (1952). *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) held only that Section 10(b) requires scienter, that a mere claim of negligence is not cognizable. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) held that where the minority stockholders' option to purchase in a merger situation was fairly presented there was no 10(b) violation. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) held that there was no private cause of action under Section 14(e) relating to fraudulent practices in a tender offer situation. The Court held also that Section 10(b) did not apply to the specific tender offer situation because the only allegation was that the opportunity to gain control of the target company had been defeated. The Court interpreted Section 10(b) as being aimed only at maintaining an orderly market for the distribution of securities free from manipulative influences and was not aimed at tender offers as such.

Moving to claimed further restrictive interpretations, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) held only that the record keeping requirements of Section 17(a) do not create a private cause of action under that provision. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) held only that the Investor Advisor's Act of 1940, 15 U.S. § 80b–1, did not create a private cause of action. *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) held

only that neither the Federal Water Pollution Control Act, 33 U.S.C. § 1251 nor the Marine Protection, Research and Sanctuaries Act of 1977, 33 U.S.C. § 1401 created a private cause of action for damages. It should be noted that these three cases in refusing to recognize private causes of action under the statutes have no relevance at all to Chemetron's situation because it is well established that there is a private cause of action under Section 10(b), and the majority opinion concedes this.

Finally, *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) held that the employee of a company printing materials related to takeover bids who on his own used the confidential information gained from such printing to buy stock and then sell it at a profit when the takeover bids became public did not violate Section 10(b) because he was under no duty to the purchasers of the stock which he sold since there was no relationship of trust and confidence.

None of the cases summarized above has any measurable impact upon the well established law as exemplified both by commentators and the lower federal courts that Section 10(b) violations can stand along side Section 9(a) violations and violations of other sections of the law. This conclusion is also confirmed by recent holdings of both the Second and the D.C. Circuits. In *Ross v. A. H. Robins Co.,* 607 F.2d 545 (2d Cir. 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), the Court held that a Section 10(b) cause of action would lie for conduct which would also justify a private remedy suit under Section 18 of the 1934 act. In *Wachovia Bank & Trust Co. v. National Student Marketing Corp.,* 650 F.2d 342 (D.C.Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3098, 3099, 69 L.Ed.2d 965 (1981) the Court thoroughly considered the overlapping remedies problem. It held that the Section 10(b) remedy was available although Section 17(a) was an express remedy also applicable. Admittedly, in this case the Court again reiterated the differences between Section 10(b) and Section 17(a) as the Court had done in *Huddleston, supra.*

It is suggested that if we allow the Section 10(b) remedy in this case we have eliminated the provisions of Section 9(a). The same argument can be turned around the other way. If we do not allow the remedy under Section 10(b), we have eliminated Section 10(b) as it relates to manipulative and deceptive schemes in the purchase and sale of securities. And this is contrary to the exact and precise wording of the Section. There is no denying the expansion of Section 10(b) has weakened the impact of Section 9(a). But that expansion took place long before this case. This earlier expansion, of course, lessened the significance of legislative history of the 1930's relied upon so heavily in the majority opinion. It is not necessary in this case to decide what other kinds of improper and fraudulent stock transactions are forbidden in Section 9(a) which may not be covered by Section 10(b). Section 9(a) is a long and complicated section, and it cannot be concluded that to hold as I here suggest wipes out the entire Section 9(a).

The compelling irony in this case is that the majority view results in freeing the more serious offender but holding the lesser offender liable for engaging in exactly the same activities, manipulative and fraudulent devices in securities transactions. Such an interpretation does not ring true.

Defendants are responsible for the actions of Williams in his manipulative and deceitful wrongdoing under Section 10(b) of the statute but which fell short of violation of Section 9(a). This liability is not because of any particular activities or techniques which are any different under Section 9(a) or Section 10(b), but solely because the jury found the activities did not "affect" the value of the stock (Section 9(a)), although it is obvious, and the majority of the Court agrees, that the activities did "touch upon the reasons for the investment's decline in value" (Section 10(b)). By the same analysis a person engaged in these stock manipulations who was *charged* with acting intentionally (scienter under Section 9(a)) and also recklessly (scienter under Section 10(b)) but who is *found* to have acted not inten-

tionally but recklessly would be free of guilt while the person *charged* only with reckless disregard of the rights of others and *proved* to have been in such a state of mind would be in violation of the law.

Posed as the issue is in the stark facts of this case, I cannot accept the cases which indicate that the Section 10(b) catch-all must be interpreted in such a way as to free from federal wrong-doing individuals who commit offenses which fall literally, specifically, and precisely within the scope of Section 10(b) when those same activities fall short of the offenses set out in Section 9(a). I therefore respectfully dissent from that portion of the majority opinion which rules out any liability on the part of defendants under the federal securities laws for these obviously forbidden securities manipulations.

REAVLEY, Circuit Judge, dissenting in part:

I join most of Judge Gee's fine opinion. I dissent, however, from the holdings (1) that Bintliff may be held liable to Chemetron as a civil conspirator and (2) that Bintliff is collaterally estopped by the findings in a case that was settled and dismissed by agreement of the parties.

### I. *Conspiracy*

There is no allegation or proof in this case to justify the court's holding that Bintliff may be liable to Chemetron as a conspirator under Tex.Rev.Civ.Stat. § 4004. The evidence shows that Hall and Williams were engaged in a manipulative scheme to enhance the price of Westec stock from September 1964 until August 1966. The sale to Chemetron took place in January 1966. The only evidence against Bintliff is that he took part in three transactions—two in May 1966 and one in July 1966—none of which concerned Chemetron. There is no evidence that Bintliff benefitted in any way from the Chemetron sale.

The majority's holding confuses concepts of criminal and civil conspiracy. The gist of criminal conspiracy is the agreement itself: the defendant is guilty of the crime of conspiracy if he agrees to commit a sub-stantive crime, regardless of whether he personally participates in or even knows of all the acts taken in furtherance of the conspiracy. That the defendant is guilty of conspiracy, however, does not make him guilty of the substantive crimes that his co-conspirators have committed as part of the conspiracy.

To hold a defendant liable in damages to a particular plaintiff as a civil conspirator, it is not enough to prove that, at some point, he became a member of the conspiracy. "[T]he gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1969). To be liable in damages as a civil conspirator, the conspirator must agree "to injure another by the commission of a particular wrong." *Id.* at 857.

The majority concedes that Bintliff could not have agreed to the "particular wrong" to Chemetron. Nevertheless, the majority holds that Bintliff may be liable by invoking the principle that a late-joining conspirator "becomes in law a party to every act previously or subsequently done by any of the others in the pursuance of it." *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 560 (1937). While this broad principle is sound for many purposes, it is clearly too broad even for the law of criminal conspiracy where guilt as a conspirator does not itself make the defendant guilty of substantive offenses his co-conspirators have committed as part of the conspiracy.

I agree with the majority that a co-conspirator need not have directly participated in or even have known of all the details of the Chemetron transaction to be liable. But *Schlumberger* requires that, at a minimum, he must have agreed to injure Chemetron by the commission of a particular wrong. Such agreement could be proved by showing that the co-conspirator joined in the scheme to sell stock specifically to Chemetron, or that, prior to the sale to Chemetron, he joined in a fraudulent scheme to sell Westec stock to all comers.

But Bintliff cannot, consistently with *Schlumberger*, be held liable in damages for a particular wrong that he could not have agreed, either directly or indirectly, to commit.

We hear of no Texas authority for the proposition that a conspirator may be held liable in damages for particular wrongs committed long before his involvement in the conspiracy.[1]

Furthermore, the evidence in this record is insufficient as a matter of law to prove that Bintliff joined in a scheme to create actual or apparent active trading in, or to raise the price of, Westec stock for the unlawful purpose of fraudulently inducing the purchase of Westec stock by the general public.

The evidence shows that Hall and Williams were engaged in a manipulative scheme to enhance the price of Westec stock from September 1964 until August 1966. As representatives of both Westec and Business Funds, which controlled Westec, they had many reasons to desire the long-term enhancement of the market price of Westec stock. The only evidence against Bintliff is that he took part in three transactions which occurred months after the January 1966 sale of stock to Chemetron. These three transactions are not sufficient circumstantial evidence to prove that Bintliff ever joined in the conspirators' broad purpose to induce the general public to buy Westec stock.

The first two Bintliff transactions took place in May 1966. Williams offered to sell Bintliff 60,000 shares of Westec stock at $40 a share when the market price was $50 a share. Bintliff made the deal and re-sold half the shares immediately. He expressed his intent to re-sell the remainder immediately, but then agreed not to sell it until November 1966.

Later in May, Williams and Hall were in need of funds to continue financing the conspiratorial scheme. Bintliff agreed to guarantee a $3,000,000 loan for 30 days. His fee was 3,000 shares of Westec, worth $150,000 on the market.

Finally, in July 1966 Bintliff guaranteed a 3 day, $3,000,000 loan for Hall. He received a guarantee fee of $216,000 and permission to sell immediately half of his remaining shares from the first transaction.

When Bintliff discovered in August 1966 that Williams and Hall could no longer get financing for their Westec purchases, he realized that the Westec market was about to crash, and he sold his remaining shares.

This evidence does not tend to prove that Bintliff ever joined in the conspirators' purpose to induce the purchase of Westec stock by the general public through manipulation of the market. Rather, the evidence shows that Bintliff engaged in three arm's-length transactions with the conspirators in which he exacted a high price for his services. It was irrelevant to him whether the conspirators' long-range manipulation scheme was successful—if, indeed, he was even aware of its scope. Bintliff was acting for his own purposes, not to advance the conspirators' purpose. In purchasing the Westec stock, he was attempting to make a quick profit on the difference between the sale price and the market price; in guaranteeing the loan, he was taking advantage of the conspirators' desperate need for financing.

1. *Standard Oil* was an action by the State of Texas to recover statutory penalties and obtain injunctive relief against the members of an agreement that violated the state antitrust laws; it was not an attempt to recover damages for particular anti-competitive acts. *See* 107 S.W.2d at 552. Thus, the only thing the state needed to prove in *Standard Oil* was membership in the conspiracy itself.

*Bourland v. State*, 528 S.W.2d 350 (Tex.Civ. App.—Austin 1975, writ ref'd n. r. e.), was an action by the state under the Texas Deceptive Trade Practices Act seeking, *inter alia*, restitution for the victims of a land development fraud. The developers' attorney was held liable for the full amount of restitution, despite his claim that he first became aware of the fraud well after the inception of the scheme. The evidence showed, however, that the attorney had profited from the scheme from its inception, and that after he learned of its fraudulent nature he joined in it, intending to perpetuate the fraud against the investors and to retain his prior, ill-gotten gains. By contrast, there is no proof in this case that Bintliff knew of or benefitted in any way from the Chemetron sale.

It is not enough to show that Bintliff knew of the conspiracy, concealed it, and profited from it. *See Schlumberger, supra.* To hold Bintliff liable in damages as a civil conspirator, the evidence must show that Bintliff intended "to injure another by the commission of a particular wrong." *Schlumberger,* 435 S.W.2d at 857. The evidence does not show that Bintliff ever shared the unlawful purpose that caused the conspirators to sell Westec stock to Chemetron.

## II. *Collateral Estoppel*

The majority holds that Bintliff is collaterally estopped by withdrawn findings in a prior case that was settled and dismissed by agreement of the parties. This holding ignores settled principles of preclusion, overrules Fifth Circuit precedent, and undermines the strong public interest in the settlement of law suits. Its application to this case is especially unfortunate, for it deprives Bintliff of the primary benefit of his agreement to settle while resulting in almost no saving in time or resources to the litigants or the courts.

The most basic prerequisite to the use of preclusion is "a judgment that is valid, final, and on the merits." 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4427, at 269 (1981) [hereinafter Wright & Miller]. An *issue* is precluded (or subject to collateral estoppel) only when it is "determined by a valid and final judgment, and the determination is essential to the judgment." Restatement (Second) of Judgments § 27 (1982); *accord, Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1166 (5th Cir. 1981); *Kaspar Wire Works, Inc. v. Leco Eng'r & Mach., Inc.,* 575 F.2d 530, 535–36 (5th Cir. 1978).

The "judgment" on which the majority bases its holding was neither final nor on the merits. Nothing was determined by the order of dismissal in the *Cosmos Bank* case but that the court approved the parties' settlement and withdrew the findings of fact that the majority today finds preclusive.

The majority reasons that the findings of fact in *Cosmos Bank* meet the requirement of a final judgment because "only the judicial act of signing a final, *known* adverse, judgment was left." But findings of fact in themselves have no operative effect, and certainly these withdrawn findings cannot be considered "essential to the judgment" that was in fact rendered: a judgment of dismissal.

The disposition of *Cosmos Bank* the majority uses was not "final." It is the general rule that a decision is not "final" for collateral estoppel purposes if it cannot be tested by appellate review. 18 Wright & Miller, *supra,* § 4433, at 315–21.[2] Bintliff could not appeal a judgment that was never entered.[3] If he had allowed the entry of

---

**2.** An exception exists if the decision "is surrounded by alternative protections or special policies that support preclusion," *id.* at 316—for example, findings adopted by the Supreme Court in cases under its original jurisdiction are given preclusive effect, *see id.* at 320–21. But the exception would swallow the rule if the requisite "alternative protections or special policies" could be found in the nonappealable findings of any district court.

**3.** The unavailability of an appeal distinguishes this case from all of the appellate court decisions on which the majority relies in finding a "final judgment." Not only was an appeal available in the prior action in each of these cases, but in all but one the appeal had in fact been taken and the appellate court had rendered its judgment. *Compare Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990, 991–92, 995–96 (7th Cir. 1979) (in prior action, court of appeals had determined as a matter of law that plaintiffs' brand name was not entitled to trademark protection), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *Kurlan v. Commissioner,* 343 F.2d 625 (2d Cir. 1965) (preclusive effect given to judgment of state supreme court despite settlement after remand on a single issue); *Zdanok v. Glidden Co., Durkee Famous Foods Div.,* 327 F.2d 944, 947 (2d Cir.) (in prior action, court of appeals had reversed a district court dismissal on the merits, had authoritatively determined the issue of liability, and remanded only for an assessment of damages), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), *with United States ex rel. DiGiangiemo v. Regan,* 528 F.2d 1262, 1265 & n.1 (2d Cir. 1975) (government had right to appeal trial court's suppression order in earlier, aborted prosecution), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3172,

judgment and then appealed, and this court had reversed and remanded for further proceedings—as it does in this case today—then the findings in the *Cosmos Bank* case could have no preclusive effect. *Id.* § 4432, at 303. And even if this court had affirmed, no finding would be entitled to preclusive effect unless that finding was necessary to the specific grounds on which the court's affirmance was based. *Hicks,* 662 F.2d at 1168 & n.6 (collecting cases); 18 Wright & Miller, *supra,* § 4421, at 205, § 4432, at 302. Thus, if the *Cosmos Bank* plaintiff prevailed in the district court on many legal theories but this court found it necessary to pass on only one, all of the findings that were not essential to the ground of affirmance would have no collateral estoppel effect.

Nor was the disposition of *Cosmos Bank* "on the merits." It is well-settled that when litigation is terminated by a consent decree, the judgment may only preclude "the issues actually intended to be precluded by the parties." *Kaspar Wire Works,* 575 F.2d at 539; *accord,* 18 Wright & Miller, *supra,* § 4443, at 382. In this case, both the parties and the trial court made express their intent that the settlement and dismissal have no collateral estoppel effect.

Recognizing these basic principles of the law of preclusion, this court held in *Associates Capital Servs. Corp. v. Loftin's Transfer & Storage Co.,* 554 F.2d 188, 189 (5th Cir. 1977), that the findings in a case that is dismissed pursuant to a settlement can have no collateral estoppel effect, even *after* judgment has been entered and the case is pending on appeal. Today the majority not only overrules *Loftin's* but goes further to give preclusive effect to findings on which a court has *never* entered judgment. The majority "distinguishes" *Loftin's* on the

ground that *Loftin's* involved "defensive" collateral estoppel, but it fails to explain how this distinction has anything to do with the requirement of a final judgment. The majority then attempts to prop up this distinction by terming *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), a "watershed case on offensive collateral estoppel" which "create[s] a 'need to redefine the doctrine of collateral estoppel.'" But the *Parklane* decision has absolutely nothing to do with the requirement of a final judgment.[4] *Parklane* is a landmark only because it abandons the requirement of mutuality; offensive collateral estoppel is itself nothing new. *See, e.g., Mason Lumber Co. v. Buchtel,* 101 U.S. 638, 25 L.Ed. 1073 (1880); 18 Wright & Miller, *supra,* § 4416, at 138 n.13. The majority fails to point to one word in *Parklane* that justifies its departure from the firm rule of this circuit that a panel cannot overrule a decision of another panel.

Apparently, the majority believes that it need not adhere to our precedent because Bintliff voluntarily chose to avoid judgment and forgo appeal. In essence, what the majority holds today is that once a trial court is prepared to enter judgment against a litigant, that litigant may not settle his case for the purpose of avoiding the collateral estoppel effect of the district court's findings. I think that is bad law and bad policy. Society maintains a strong interest in settlements at every stage of litigation. The majority claims that this interest is not served here because "the reason that settlements are favored is that they avoid litigation," and that "the savings of legal resources by settling after a full trial [a]re nominal." Even assuming, without agreeing, that "the" only reason settlements are favored is that they conserve legal re-

---

49 L.Ed.2d 1187 (1976). These decisions provide little support for the majority's holding in this case, where the court in the prior action never reached a legally operative determination of any rights of the parties, and where no appeal was ever available.

4. *Migues v. Fibreboard Corp.,* 662 F.2d 1182, 1187 (5th Cir. 1981), which the majority also cites in its effort to disregard *Loftin's,* involved

no collateral estoppel issue at all. The dictum quoted by the majority came in the course of a discussion concerning the "latent" question whether the abandonment of mutuality in *Parklane* could be extended to allow offensive collateral estoppel against a defendant who was not a party to the earlier litigation. Thus, not even the dictum in *Migues* concerned the requirement of a final judgment.

sources,[5] I do not agree with the majority's estimation of the potential savings.

Certainly the majority is wrong in its estimation of the savings in this case.[6] But more importantly, today's decision will deter post-trial settlements and force all defendants facing multi-plaintiff litigation to appeal every adverse finding of fact made by every trial court. Even if the defendant believes that his appeal is unmeritorious—because, for example, the particular plaintiff is entitled to prevail on one of many legal theories—the defendant will be forced to challenge all of the findings and alternative bases of recovery on which he believes the trial court erroneously relied. "[F]orcing a losing litigant to take an appeal he knows he will lose on the basis of one alternative ground is a waste of the resources of both litigants and courts, and is contrary to the principles of judicial economy which motivated the doctrine of collateral estoppel in the first place." *Hicks*, 662 F.2d at 1169. And while these unnecessary appeals are pending, the preclusive effects of the trial courts' findings will remain uncertain, since a reversal or an affirmance on an alternative ground will prevent the application of collateral estoppel. *See generally* 18 Wright & Miller, *supra*, § 4433, at 311–13.

The sole authority the majority finds for its decision today is *Aetna Cas. & Surety Co. v. Jeppesen & Co.*, 440 F.Supp. 394 (D.Nev.1977), *vacated on other grounds*, 642 F.2d 339 (9th Cir. 1981). That district court decision has not met with favor elsewhere.

> [T]he result [in *Aetna*] is questionable at best. The terms of settlement and dismissal would make it impossible to apply issue preclusion between the parties to the original action. The prospect of applying preclusion in favor of a non-party

---

**5.** Settlements are favored for many reasons besides the conservation of judicial and other legal resources.

In addition to ending the uncertainty and anxiety of the litigants concerning the results of further litigation, settlements also resolve any doubts concerning the correctness of the court's fact findings and the justness of the remedy it devises. Because " '[t]here are "two sides" to most disputes,' " *Howard v. Commissioner*, 447 F.2d 152, 158 (5th Cir. 1971) (quoting Corbin on Contracts § 620 (1960)), "[o]ne of the fundamental principles of judicial administration is that, in most cases, the absolute result of a trial is not as high a quality of justice as is the freely negotiated, give a little, take a little settlement." Will, Merhige & Rubin, *The Role of the Judge in the Settlement Process*, 75 F.R.D. 203, 203 (1976) (remarks of Judge Will). *See generally* J. Frank, *Facts are Guesses*, in Courts on Trial 14 (1949).

Settlements also protect the litigants' interest in autonomy, allowing them to reach their own solution to their dispute rather than having a remedy imposed on them by a legal system that may not necessarily share the litigants' own shared norms. *See generally* Eisenberg, *Private Ordering Through Negotiation: Dispute-Settlement and Rulemaking*, 89 Harv.L.Rev. 637, 656–57 (1976).

Moreover, it has long been recognized that the restoration of amicable and socially useful relationships is more likely to result after a negotiated settlement than after a litigated fight to the finish. *See Howard v. Commissioner*, 447 F.2d at 158; Eisenberg, *supra*, at 646.

**6.** Despite the majority's hyperbole about "years of discovery" and "several weeks of trial," it is obvious that the only savings in this case will be the time and expense of retrying issues that the parties have already tried once. In my estimation, it is this savings that is "nominal" when compared to the savings that resulted when Bintliff agreed to settle the *Cosmos Bank* case. There is no reason to believe that an appeal in *Cosmos Bank*—which involved smaller stakes but issues similar to those in this case—would have consumed significantly less time than the over two-and-one-half years that have elapsed since the district court entered judgment in this case. During the pendency of that appeal, the preclusive effects of the *Cosmos Bank* findings would have remained uncertain. *See* 18 Wright & Miller, *supra*, § 4433, at 311–13. Since a reversal in *Cosmos Bank* would have nullified any reliance on the *Cosmos Bank* findings in this case, *see id.* § 4432, at 303, as a practical matter the parties would have been forced to relitigate the issues, await the court of appeals' decision in *Cosmos Bank*, or risk retrial of this complex case when and if *Cosmos Bank* was reversed.

The majority makes the mathematically indefensible claim that the *Cosmos Bank* settlement has resulted in "no" savings to the judicial system, because "this issue has now come before an appellate court." What issue? No appellate court has even considered whether possible trial errors, incorrect interpretations of law, or insufficiency of evidence would require reversal of all or part of the judgment that was never entered in *Cosmos Bank*.

is little more attractive. Not only did the settlement sacrifice the possibility of appeal from the findings of liability, but the subsequent use of preclusion may make it more difficult to settle cases in this posture.

18 Wright & Miller, *supra*, § 4433, at 318 (footnote omitted).

Finally, the majority's holding is unfair to Bintliff. As the majority acknowledges, the primary reason that Bintliff settled *Cosmos Bank* was to avoid the application of collateral estoppel. He relied on well-settled rules of law in deciding to settle. He gave up his right to appeal, the exercise of which would either have delayed the trial in this case or prevented, for all practical purposes, the use of collateral estoppel in this case. He saved the judicial system a certain appeal and a possible retrial and second appeal, and saved his adversary additional time and expense in collecting damages. Nevertheless, today the majority disregards his justifiable reliance interests and deprives him of the primary benefit of his bargain. The majority says that the rules of collateral estoppel are based on "fairness," but I see nothing fair about the majority's decision.